**In re VOGEL VAN & STORAGE, INC., Debtor.**

**William M. McCARTHY, Esq., as Trustee for the Estate of Vogel Van & Storage, Inc., Appellant,**

v.

**NAVISTAR FINANCIAL CORPORATION, f/k/a International Harvester Credit Corp. and Navistar, Inc., f/k/a International Harvester Company, Appellee.**

**No. 94–CV–138 (FJS).**

United States District Court, N.D. New York.

June 23, 1997.

Motion to dismiss denied, and judgment affirmed.

Hodgson, Russ, Andrews, Woods & Goodyear (Richard L. Weisz, of counsel), Albany, NY, for Appellant.

Thorn and Gershon (Murry S. Brower, of counsel), Albany, NY, for Appellee.

### MEMORANDUM DECISION AND ORDER

SCULLIN, District Judge.

Presently before the Court are: (1) the appeal pursuant to 28 U.S.C. § 158 from an order of the United States Bankruptcy Court for the Northern District of New York (Mahoney, J.) finding certain invoice payments not avoidable as preferential payments under 11 U.S.C. § 547(b), because they occurred in the "ordinary course of business," pursuant to § 547(c)(2), and (2) appellee's motion to dismiss the appeal on the ground that appellant lacks standing.

### BACKGROUND

On May 30, 1985, appellee Navistar Financial Corporation ("Navistar"), then known as International Harvester Credit Corp., issued a series of invoices (Numbers 622–626) to the debtor, Vogel Van & Storage, Inc. ("Vogel"), for payment on a number of over-the-road trucks sold and delivered during the spring of 1985. By the terms of the invoices, payment was due on June 29, 1985.

On July 2, 1985, Vogel issued a check in the amount of $412,642.00 on certain *other* Navistar invoices. This check was returned

for insufficient funds. Shortly thereafter, representatives of Navistar and Vogel met in Albany, New York, at the Vogel facility to discuss making good on the returned check.

In the meantime, Vogel failed to make payment on Invoices 622–626 by the due date of June 29, 1985. Throughout the beginning of July, Robert S. Schraver, Navistar's fleet sales vendor and effectively the salesman on the Vogel account, spoke with Vogel agents by phone roughly every other day. In addition to discussing other business, he reminded Vogel's agents that payment on Invoices 622–626 was past due. At some point toward mid-July, Vogel advised Schraver that it would make payment on July 17, 1985, and asked him to come to Vogel's offices to pick up the check. On July 17, Schraver picked up a check in the amount of $347,409.80 from Vogel's offices, in payment of Invoices 622–626. This transfer is the subject of this preference action.

Trial testimony before the Bankruptcy Court indicated that ordinarily Navistar's salesmen who personally picked up checks from their customers would forward payment by mail to a lockbox at Navistar's bank, Bank of Boston. Much less frequently, Navistar's salesmen would personally deliver payment to superiors. On this occasion, Schraver met Murphy at a rest area on the New York State Thruway and handed him the check.[1]

Vogel's payment was credited by Navistar on July 18, 1985, 49 days after the date of the invoice. However, Navistar did not actually deposit the check until July 30, 1985, and no one from Navistar was able to explain what happened with the check between July 18 and July 30. During this 13–day period, Vogel made good on its previous "bounced" check to Navistar of $412,000 ($200,000 by wire transfer and $212,000 by bank check).

Vogel filed for voluntary relief under Chapter 11 of the Bankruptcy Code on October 24, 1985. The case was converted to Chapter 7 and Trustee William M. McCarthy (the "Trustee") was appointed in March of 1986. The 90–day preference avoidance period of 11 U.S.C. § 547 commenced July 26, 1985.

The Trustee brought an action before the Bankruptcy Court seeking to avoid the allegedly preferential $347,409.80 transfer from Vogel to Navistar. An adversary proceeding was held before the Bankruptcy Court in November of 1992. On June 28, 1993, the court issued an order in which it found that the transfer at issue was made in the ordinary course of business for the debtor and creditor, and thus excepted from avoidance as a preference. *See* 11 U.S.C. § 547(c)(2). Judgment was entered for Navistar on June 28, 1993.

On July 26, 1993, the Trustee filed a Notice of Appeal. Time to perfect that appeal to this Court was extended by the Bankruptcy Court several times while the Trustee offered to settle the appeal with Navistar. According to the Trustee, he offered to settle the appeal with Navistar for $45,000.00, but Key Bank, the largest single creditor of the estate, objected to the settlement. Key Bank offered the Trustee an unusual arrangement: Key Bank agreed to pay the Trustee $45,000 in return for the Trustee abandoning the settlement attempt and authorizing Key Bank to litigate the appeal before this Court on the Trustee's behalf. The Trustee agreed.

By order dated November 23, 1993, the Bankruptcy Court authorized an agreement between the Trustee and Key Bank, whereby Key Bank undertook the appeal of the Bankruptcy Court's June 28 Order on behalf of the Trustee, with Key Bank bearing the expenses of the appeal.[2] In return, Key Bank agreed unconditionally to pay $45,000 to the estate. Navistar objected to the arrangement.

Key Bank, on the Trustee's behalf, perfect-

---

1. It is not clear why on this occasion there was a hand-off between Navistar employees. Schraver's testimony suggests that it was to make sure the check was credited quickly so that interest did not accrue against Vogel. Another Navistar employee suggested that it was a practice employed when a number of large checks came in on a given day.

2. The agreement allows the expenses of appeal to be reimbursed by the estate if Key Bank prevails and the Bankruptcy Court so authorizes.

ed the appeal which is now before the Court.[3] Navistar brought a motion to dismiss on the grounds of appellant's failure to file a timely notice of motion and lack of standing. By an order dated July 26, 1994, this Court granted that motion, dismissing the instant appeal for failure to file a timely notice of appeal. By its decision of June 21, 1995, the Court of Appeals for the Second Circuit reversed this Court's determination and remanded the matter for further proceedings. *In re Vogel Van & Storage, Inc.*, 59 F.3d 9 (2d Cir.1995). Therefore, the appeal and the motion to dismiss are before this Court on remand.

## DISCUSSION

### A. Appellant's Standing

■ In its motion to dismiss, Navistar contends that appellant lacks standing to prosecute this appeal of the Bankruptcy Court's order because only the trustee can prosecute a preference action, and appellant is not the trustee. Appellant responds that it *is* the trustee, in the sense that its attorneys are acting on the behalf of, and with the authorization of, the Trustee.[4]

■ It is well-established law that individual creditors cannot bring suits to avoid preferences on their own behalf. *See* 5 Collier on Bankruptcy ¶ 547.11[5], at 547–97 (15th ed.rev.1996). Rather, that power is exercisable only by the trustee or debtor-in-possession. *See In re Conley*, 159 B.R. 323, 324 (Bankr.D.Idaho 1993) ("[i]ndividual creditors generally have no remedy to institute

such an action ... except through the trustee or debtor-in-possession" (quotation omitted; alteration in *Conley* )).[5]

■ Further, it is also a "well-settled principle that neither a trustee in bankruptcy, nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid a preference." *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr.E.D.N.Y.1981); *see Conley*, 159 B.R. at 324; *In re Sun Island Foods*, 125 B.R. 615, 618 (Bankr.D.Hawai'i 1991). "[T]he creditors of the estate have no right to proceed independently ... on behalf of the estate." *In re New York Int'l Hostel, Inc.*, 157 B.R. 748, 753 (S.D.N.Y.1993) (quotation omitted).

■ However, while these cases clearly indicate that an individual creditor cannot pursue an avoidance action *on its own behalf,* whether assigned to it by the trustee or not, nothing in the Bankruptcy Code indicates that a trustee cannot authorize a creditor to litigate an avoidance action *on the trustee's behalf.* As the Third Circuit has explained, "[t]he rule that individual creditors cannot act in lieu of the trustee is often breached when sufficient reason exists to permit the breach." *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94 (3d Cir.1986) (discussing in the context of § 506(c)). The circumstances of this case seem to support such an action, and the bankruptcy court was well within its discretion in authorizing it. *See In the Matter of Boerne Hills Leasing Corp.*, 15

---

**3.** This appeal is brought by Key Bank's attorneys in the primary bankruptcy action, yet those attorneys claim to represent the Trustee before this Court.

**4.** Appellant also contends that standing is supported by the Bankruptcy Code provision allowing creditors to recover expenses incurred by "a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor." 11 U.S.C. § 503(b)(3)(B). Although appellant cites several cases in which a creditor recovered such expenses, these cases beg the question on appeal: in each of these cases, the creditor clearly had standing to take action to recover for the benefit of the estate. Section 503(b)(3)(B) does not itself confer standing; rather, it merely authorizes the recovery of certain expenses. *See In re SRJ Enters., Inc.*, 151 B.R. 189, 193 n. 1 (Bankr.

N.D.Ill.1993) ("But § 503(b)(3)(B) does not confer standing; it only authorizes recovery of expenses to a creditor who successfully recovered property, which is to say, a creditor who had standing in the first place.").

**5.** There is a limited exception to this rule, established by the Second Circuit, which allows a creditors' committee to bring an avoidance action in Chapter 11 cases where the creditors' committee shows that the trustee or debtor-in-possession unjustifiably refused to bring the avoidance action. *In re STN Enters.*, 779 F.2d 901, 904 (2d Cir.1985). In extraordinary circumstances, this exception has been extended to individual creditors. *See, e.g., In re The Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir.1995). This exception is inapplicable to the case at hand.

F.3d 57, 60 (5th Cir.1994) (party may only pursue avoidance claim under § 545(2) after seeking authorization from bankruptcy court to act on trustee's behalf); *In the Matter of Natchez Corp.*, 953 F.2d 184, 187 (5th Cir. 1992) ("A creditor may [invoke the avoidance powers of § 549] on behalf of the trustee or debtor-in-possession if it has moved the bankruptcy court for authorization to do so and has shown appropriate circumstances which would permit such action."). In this case, the Trustee agreed to have Key Bank litigate on his behalf, and the Bankruptcy Court fully authorized the arrangement in its November 23, 1993 order, which states:

> [I]t appearing to this Court that the assets of the estate can be best preserved by allowing Key at its own expense to pursue the appeal of this Court's decision in the estate's preference action against Navistar .... over the objections of Navistar, it is
>
> ORDERED, that Key in its discretion is hereby authorized to prosecute and conduct the appeal from this Court's Decision and Order dismissing the estate's preference claim against Navistar....

Courts have refused to allow assignment or sale of avoidance claims by the Trustee because such transfers would run contrary to two primary policies underlying the Bankruptcy Code. First, the Code allows only the trustee or debtor-in-possession to sue on a preference because only that trustee or debtor-in-possession represents the interests of all the creditors in maximizing the value of the debtor's estate. *See Conley*, 159 B.R. at 325 ("These avoidance powers are for the benefit of the estate[.]"); *see also Wellman v. Wellman*, 933 F.2d 215, 217–18 (4th Cir.1991) (preferences under §§ 548 and 550 must be recovered for the benefit of the estate). Second, permitting trustees alone to sue on a preference "facilitate[s] the prime bankruptcy policy of equality of distribution among creditors of the debtor." H.R.Rep. No. 95–595, at 177–78 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138. It is feared that by allowing one creditor to buy a claim from the trustee and pursue that claim on his own

behalf, that creditor may be allowed to recover more of the estate's assets than would otherwise rightfully be due to that creditor. *See Sapolin Paints*, 11 B.R. at 937 ("The reasons [for not allowing assignment of preference actions] are self-evident: The power to avoid a preference is one which is to be exercised in the interests of securing equality of distribution among creditors.").

However, neither of the concerns that make sale or assignment of avoidance actions so offensive to the Code are implicated in the "authorization" presented in this case. The estate stands to maximize its recovery, and there is no danger of inequitable recovery. Any fruits of this appeal will be collected by the estate, not by any individual creditor. For the Trustee and the estate, this arrangement holds nothing but upside potential. If Key Bank wins, the estate receives $45,000 plus the recovery on the appeal, less attorney's fees. If Key Bank loses, the estate still receives $45,000 from Key Bank, and is liable for no attorney's fees. The benefits of the arrangement accrue almost entirely to the estate, whereas the costs and risks of litigation are borne by Key Bank. In fact, this is a far superior situation from the estate's perspective than having to pursue the appeal on its own, regardless of whether it would succeed in settling the appeal.[6]

Nothing in this arrangement threatens the equitable distribution of the estate's assets. The Trustee retains control over the claim and over any assets which are brought into the estate through the preference action. The proceeds of the action will be added to the estate and the estate as a whole will be divided between creditors according to the dictates of the Code. Key Bank, though authorized to pursue the appeal, gains no priority with regard to the assets which it brings into the estate.

These circumstances support a finding that Key Bank may pursue this action on behalf of the Trustee. *Cf. In re The Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir.1995) ("We

---

6. A similarly beneficial result would seem likely in other bankruptcy cases where the estate, for whatever reason, viewed a preference appeal claim less favorably than did a creditor. If that

creditor were willing to insulate the trustee from the loss of any settlement claim, and undertake an appeal on behalf of the estate, such a result does not seem to offend the Code.

believe that Congress has not precluded the bankruptcy court from granting standing to a creditor if such standing furthers Congress's purpose in creating the avoidance actions found in 11 U.S.C. §§ 547 and 548 in the context of a Chapter 11 reorganization."). This Court finds no reason not to allow trustees to "deputize" a creditor to sue to avoid preferences on the trustee's behalf, as long as the fruits of the action belong to the estate, and the trustee retains control over the action.

## B. Substantive Appeal

The District Court reviews a Bankruptcy Court's "conclusions of law *de novo,* and findings of fact under a clearly erroneous standard." *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 988 (2d Cir.1990). "[I]t is axiomatic that this court will reverse the Bankruptcy Court only if it is left with the definite and firm conviction that a mistake has been committed." *In re Abrantes Constr. Corp.,* 132 B.R. 234, 236 (N.D.N.Y.1991) (internal quotation omitted).

■ The parties have stipulated that the $347,409.80 transfer was preferential within the meaning of 11 U.S.C. § 547(b). Therefore, the only issue before the Bankruptcy Court was whether the transfer fell within the "ordinary course of business" exception of § 547(c)(2). This exception provides in pertinent part:

The trustee may not avoid under this section a transfer—

. . . .

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2). Section 547(c)(2) is a three-part conjunctive test, and Navistar bears the burden of proving each part by a preponderance of evidence. *See id.* § 547(g);

*In re Roblin Indus., Inc.,* 78 F.3d 30, 39 (2d Cir.1996).

It is undisputed that the debt was incurred by the debtor in the ordinary course of business. *See* 11 U.S.C. § 547(c)(2)(A). Thus, the issue before the Bankruptcy Court and before this Court on appeal is whether Navistar bore its burden of showing that the transfer satisfied subparagraphs (B) and (C).

■ Congress explained in 1977 that the purpose of § 547(c)(2)

is to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.

H.R.Rep. No. 95–595, at 373, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329. Section 547(c)(2) "is intended to protect recurring, customary credit transactions that are incurred and paid in the ordinary course of business of the debtor and the debtor's transferee." 5 Collier on Bankruptcy ¶ 547.04[2], at 547–47 (15th ed. rev.1996).

■ Subparagraph (B) requires a subjective examination of whether a transfer was ordinary between the parties to the transfer, *see In re Fred Hawes Organ., Inc.,* 957 F.2d 239, 244 (6th Cir.1992), meaning whether the payments "were consistent with the course of dealings between the particular parties." *In re Yurika Foods Corp.,* 888 F.2d 42, 45 (6th Cir.1989) (quotation omitted). In adjudging these matters, courts engage in a "peculiarly factual analysis of the business practices which were unique to the particular parties under consideration." *In re Finn,* 909 F.2d 903, 907 (6th Cir.1990) (internal quotations omitted).

■ Subparagraph (C) asks whether the payment was "made according to ordinary business terms." In *In re Roblin Industries, Inc.,* the Second Circuit concurred with the majority of circuits addressing this section by holding that "§ 547(c)(2)(C) requires a creditor to demonstrate that the terms of a payment for which it seeks the protection of the ordinary course of business exception fall within the bounds of ordinary practice of

others similarly situated," meaning normal practice in the industry as a whole.[7] 78 F.3d at 41. In doing so, the Second Circuit expressly adopted the interpretation given by the Seventh Circuit in *In the Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993), which held "that only dealings so idiosyncratic as to fall outside that broad range [of industry practices] should be deemed extraordinary and therefore outside the scope of subsection C." *Id.* at 1033.

 In determining what is in the "ordinary course of business" under both subparagraphs, courts typically examine several factors, including the amount of payment, timeliness of payments, existence of any unusual debt collection practices, and the form of, and circumstances surrounding, payment. *See, e.g., Yurika Foods*, 888 F.2d at 45; *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir.1986). As regards the first factor, the Bankruptcy Court correctly found nothing unusual about the amount of the payment. The full amount due—$347,409.80—was tendered.

 Appellant argues that the Bankruptcy Court's finding that the timing of the payment was customary was clearly erroneous. Whether the timing of a payment is ordinary is generally controlled by the payment terms of the agreement between the parties. *See In re Masters*, 137 B.R. 254, 261–62 (Bankr.S.D.Ohio 1992). However, it is fairly well established in caselaw that late payments can be the norm, both between particular parties and in the industry as a whole. *See, e.g., In re Grand Chevrolet, Inc.*, 25 F.3d 728, 732 (9th Cir.1994); *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991); *Yurika*, 888 F.2d at 44; *In re Rave Communications, Inc.*, 128 B.R. 369, 372–73 (Bankr.S.D.N.Y.1991). "A late payment is considered ordinary if it is within the pattern of payments between the parties." *In re A.J. Lane & Co., Inc.*, 164 B.R. 409, 414 (Bankr.D.Mass.1994).

 In this case, the unpaid invoice balances were due and payable on June 29, 1985. Payment was actually tendered July 17, 1985, approximately 48 days from delivery, or 18 days past due. The Bankruptcy Court found that while "Navistar's standard written contracts ... contained normal 30–day payment terms after delivery[,] ... [t]here was testimony that in general payments made by Vogel were 'slow' and would be made beyond the 30–day net period." Further, the court found that "[o]n average, forty-five days from delivery was the normal repayment period for Navistar's customers. There is also support in the record that it was customary in the industry for large fleet customers to often pay beyond the 30–day net period." The court concluded "that notwithstanding the literal payment terms calling for 30 days net, the timing of the payment was customary as between the parties." This Court finds no error in the Bankruptcy Court's conclusion that the timeliness of the payment was not out of the ordinary for these parties, nor for the industry as a whole.

 Appellant also contends that Navistar exerted unusual pressure on Vogel to make the $347,409.80 payment. In particular, appellant argues that in early July of 1985, after a $412,000 check from Vogel on other invoices had "bounced," Navistar's fleet sales vendor, Schraver, was calling Vogel every other day demanding payment, reflecting the heavy pressure on him from his Navistar superiors to collect the $347,409.80 due from Vogel. Caving under this pressure, Vogel advised that it would make payment on

---

**7.** Appellant contends that the Bankruptcy Court erred in crediting the testimony of former Navistar employees on the conformity of the transfer to industry practices. In particular, appellant contends that the court erred by not requiring expert testimony on the subject. Certainly many courts have relied on expert testimony to establish, for example, industry practice as to the length of time it usually takes suppliers to be paid by customers. *See, e.g., In re Valley Steel Corp.*, 182 B.R. 728, 733–34 (Bankr.W.D.Va. 1995). However, appellant fails to cite any case requiring expert testimony. Indeed, courts routinely rely on non-expert testimony to establish industry practice. *See, e.g., In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*, 9 F.3d 680, 685 (8th Cir.1993); *In the Matter of Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993). In finding "nothing particularly unusual" about the transaction under § 547(c)(2)(C), the Bankruptcy Court clearly credited the testimony of the witnesses proffered by Navistar. This Court finds no error on this point.

July 17, which it did. The Bankruptcy Court concluded without explanation that "there is no evidence that Navistar executed [sic] any pressure or force or took any extraordinary measures to receive payment of the $347,000 check in question." This Court agrees that Navistar's conduct did not constitute unusual collection efforts.

As is often repeated, "[s]ubsection 547(c)(2) protects those payments that do not result from 'unusual' or 'extraordinary' debt collection practices." *In re L. Bee Furniture Co.*, 203 B.R. 778, 782 (Bankr.M.D.Fla. 1996); *see In re Bob Grissett Golf Shoppes, Inc.*, 78 B.R. 787, 790 (Bankr.E.D.Va.1987). One typical instance of unusual collection practice is the use of telephone calls to pressure a debtor into payment. *See, e.g., Craig Oil*, 785 F.2d at 1565 (payments deemed not in ordinary course due in part to telephone call demanding a show of "good faith"); *In re Miniscribe Corp.*, 123 B.R. 86, 94 (Bankr. D.Colo.1991) (finding phone calls and a faxed letter exerted economic pressure on debtor). Of course, in many circumstances, a phone call or two demanding an overdue payment or threatening to delay further deliveries until overdue payments are made will be ordinary between parties. *See L. Bee Furniture*, 203 B.R. at 782 (payments were always late; creditor always called to ask for payment); *In re Valley Steel Corp.*, 182 B.R. 728, 732 (Bankr.W.D.Va.1995) (persistent phone calls were normal for creditor when accounts reached a certain age); *In re Gardner Matthews Plantation Co.*, 118 B.R. 384, 386 (Bankr.D.S.C.1989) (phone calls during preference period demanding payment and threatening to stop future sales were ordinary).

At trial, Schraver testified that when Vogel was slow in payment, which was usually the case, Schraver would normally make a "[p]hone call just to remind them that ... the invoice ... was due." Tr. at 19. According to Navistar, Schraver testified that he was usually in contact with Vogel before the payment was made because there were usually trucks left to deliver. As regards the phone calls prior to the July 17 payment, Schraver testified that "we were pretty much in touch a number of days, like every other

day or whatever because there was still units that were still being delivered and so forth and he was aware of payments that were due and he said I'll have a check for you on the 17th." Tr. at 20.

While in some instances, phone calls urging payment will take payment out of the ordinary course of business, in the context of this business relationship phone calls to collect payment seemed to be the norm. Furthermore, there was no evidence that those calls contained economic or other coercion to induce unusual payment. Therefore, this Court cannot find that the Bankruptcy Court was clearly erroneous in concluding that there were no unusual debt collection practices connected with this transfer.

 Finally, appellant argues that the circumstances surrounding the actual transfer to Navistar were out of the ordinary. In particular, appellant notes that the check was delivered by hand to a Navistar employee at Vogel's place of business on July 17, instead of being sent to a bank lockbox as was the ordinary practice. Appellant also points to the facts that the Navistar employee who picked up the check met with a superior that same day at a rest stop on the New York State Thruway and handed the check off to him, and also that Navistar apparently held onto that check for 13 days before depositing it. The Bankruptcy Court found that "[w]hile mailing to a lockbox may have been more ordinarily followed, it was not outside of the course of dealings between the parties to have vendors stop by for payments," and further that any conduct of Navistar's agents occurring after the debtor made the payment is "of no moment." There was testimony before the Bankruptcy Court that Navistar's customers typically paid their invoices by check and that those checks were frequently picked up by Navistar salesmen and sent to a bank lockbox in Boston. Given that Schraver's conduct conformed with usual Navistar practice, it is not in itself out of the ordinary. After examining the record carefully, and viewing the Bankruptcy Court's determinations with appropriate deference, this Court finds that the circumstances surrounding the

transfer, although in some ways unusual, were not out of the ordinary.[8]

Appellant argues that the Bankruptcy Court erred in refusing to consider the usualness of the subsequent internal handling of this check at Navistar as immaterial to the regularness of the transfer by Vogel. It is true that when determining whether a payment is preferential, the state of mind of the creditor is immaterial, whereas the state of mind of the debtor is determinative. *See Craig Oil*, 785 F.2d at 1566 (state of mind of debtor goes to "explain the unusual payment actions by the debtor"). However, when this Court receives evidence of unusual conduct by the creditor, it must consider whether the transfer between the debtor and creditor was related to that unusual conduct. In this case, the fact that Navistar employees handed off the check at a New York State Thruway rest stop, and their subsequent delay in depositing the check, while somewhat unusual,[9] will not make the July 17 transfer out of the ordinary. In conclusion, this Court agrees with the Bankruptcy Court that there is nothing to suggest that Schraver's personal pick-up of the check was out of the ordinary, and while Navistar's subsequent conduct is peculiar, this Court is unable to infer from it that debtor's transfer was out of the ordinary course of business.

## CONCLUSION

For the foregoing reasons, appellee's motion to dismiss is DENIED and the judgment of the Bankruptcy Court is AFFIRMED.

**IT IS SO ORDERED.**

---

8. There was testimony before the Bankruptcy Court that Navistar's customers typically paid their invoices by check and that those checks were frequently picked up by Navistar salesmen and sent to a bank lockbox in Boston. Given that Schraver's conduct conformed with usual Navistar practice, it is not in itself out of the ordinary.

9. It is not self-evident that the Thruway hand-off was in fact unusual, given the testimony of Navistar's employees. *See supra* note 1.