247 B.R. 595 (2000)
In re CARROZZELLA & RICHARDSON, Debtor.
Michael J. Daly, as chapter 7 trustee for Carrozzella & Richardson, Plaintiff/Appellant,
v.
Christina Radulesco and George Radulesco, Defendants/Appellees.
No. 99-50073.
United States Bankruptcy Appellate Panel of the Second Circuit.
April 21, 2000.
*596 *597 Neubert, Pepe & Monteith, P.C., New Haven, Connecticut, by Douglas Skalka, Jody W. Menon, for the plaintiff/appellant.
Law Offices of Robert G. Wetmore, Yalesville, Connecticut, by Robert G. Wetmore, for the defendants/appellees.
Before: GERLING, NINFO, and GALLET, Bankruptcy Judges.

MEMORANDUM DECISION AND ORDER
GALLET, Bankruptcy Judge.
I. INTRODUCTION
The Bankruptcy Court (Dabrowski, J.) held that certain funds paid by the Debtor within ninety days prior to the filing of the bankruptcy petition were not preferential payments because the funds were held in an express trust by the Debtor for the benefit of the Defendants and, therefore, not property of the estate. For the reasons set forth below, we reverse.
II. FACTS
An involuntary chapter 7 petition was filed against Carrozzella & Richardson (the "Debtor") on July 19, 1995. On August 21, 1995, an Order for Relief was entered and Michael J. Daly was appointed trustee (the "Trustee"). He commenced an adversary proceeding against George Radulesco ("George") and Christina Radulesco ("Christina") (collectively, the "Defendants") January 13, 1997, seeking to avoid certain transfers by the Debtor which he alleged to be preferences.[1]
*598 The Debtor was a general partnership operating as a law firm, which, according to the testimony at the trial on November 17, 1997, began operating as an investment firm in the early 1980's. Sometime in 1994, Christina hired one of the Debtor's partners, John A. Carrozzella ("Carrozzella"), to represent her in a legal proceeding to recover over 20 years in support arrears from her former husband. At the time Carrozzella was hired, George was serving as his father's conservator. George also dealt with Carrozzella on behalf of his mother due to her advanced age and limited comprehension of the English language. At Carrozzella's suggestion, and in anticipation of his mother's recovery of the arrears, George testified that in approximately July, 1994 he gave $110,000 from his father's conservation funds to the Debtor to be held for Christina. Subsequent to a judicial award of $127,600, George transferred an additional $17,600 to the Debtor in April 1995. It was George's understanding that the monies would earn interest at the rate of 5% (tax free) and would be available to the Defendants on demand.
The Debtor maintained a single bank account (the "Account") into which it deposited all receipts and revenues, such as: escrow funds, legal fees and money from "investors." Richard Finkel, CPA ("Finkel"), the Trustee's accountant, described the Account as follows: "All money that came into the firm, whether it was from a real estate closing, legal fees, so-called investors, whatever it was went into [one] pot of money." Transcript of November 17, 1999 hearing ("Tr.") at 13.
No escrow or investment accounts were maintained for the people who deposited money with the Debtor. A segregated account was not maintained for the money that the Defendants gave the Debtor. The Debtor did, however, maintain records detailing how much money each person had "on deposit" with the firm, as well as information regarding the amount of interest that each "deposit" was supposed to be earning and what "withdrawals" had been made.
Finkel further testified that he believed that the Debtor was operating a Ponzi scheme. He described a Ponzi scheme as,
an investment scheme whereby money is taken from individuals, they are promised an above market rate of return. In order to pay those early investors in the scheme money later  money is taken from later investors, people who come in later, and given back to those early investors as a way of keeping the scheme going. I believe that's what was going on here.
Tr. at 14.
Finkel also testified that after reviewing the books and records of the Debtor he was unable to distinguish between an "investor" and a "depositor." According to Finkel, the Debtor paid its operating expenses, including employee salaries, from the Account. It also used money from the Account to invest in various ventures, including real estate holdings. At the time that the Debtor was forced into bankruptcy, its liabilities exceeded its assets by at least $8 million.
George testified that he "never knew that [Carrozzella] was anything else but a lawyer." Tr. at 94 "We used him for a certain action. We left the money." Id. On or about June 6, 1995, the Debtor issued two checks from the Account to the Defendants in the amount of $1,700 and $3,900 (the "Transfers").[2] The money from the Transfers was used for Christina's care.
The parties stipulated to the presence of certain elements of a preference, namely: (1) the Transfers were made within ninety days of the petition date, (2) at the time of the Transfers, the Debtor was insolvent *599 and (3) that the Transfers enabled the Defendants to receive more than they would receive as creditors in a Chapter 7 liquidation.
III. DECISION BELOW
The Bankruptcy Court found that both Finkel and George were credible witnesses. Their testimony was not in conflict and so it accepted each witnesses' account of the relevant facts. The Bankruptcy Court then concluded, as a matter of law, that the Trustee had established all of the elements of a preferential transfer outlined in § 547(b) of the United States Bankruptcy Code (the "Code"). In addition to the stipulated elements, the Bankruptcy Court concluded that the Defendants were creditors of the estate because they had a right to payment. See 11 U.S.C. §§ 101(5) & 101(10) (1998). It also concluded that the Transfers were on account of an antecedent debt because the Debtor was liable for the repayment of the funds deposited with it. See 11 U.S.C. § 101(12) (1998).
The Bankruptcy Court also held that
the Debtor was involved, through the fraudulent activity of Attorney Carrozzella, in a criminal enterprise possessing many of the attributes of a `Ponzi' scheme  in which funds placed with [the Debtor] by later depositors, such as the Defendants here, are secretly and illicitly utilized to pay returns and repay principal to earlier depositors.
Memorandum of Decision on Complaint to Avoid Preferential Transfers dated August 18, 1999 (the "Memorandum Decision") at 5.
Despite the prima facie showing by the Trustee that the transfers were preferences and the Bankruptcy Court's conclusions regarding the Ponzi-like nature of the Debtor's activities, the Bankruptcy Court held that the money transferred was not the Debtor's property but instead was the Defendants' own property. It reached this conclusion based upon its determination that the Debtor and the Defendants had a trustee-beneficiary relationship and that when George gave the $127,600 to the Debtor an implied oral express trust was created for the benefit of Christina. The Bankruptcy Court found that an express trust was present because: (1) George credibly testified that it was his intent to leave the money with the Debtor for the benefit of Christina and (2) the Debtor intended to accept the monies as a trustee because it nominally maintained some of the formalities that an attorney who is holding client funds maintains. "For instance, (i) the Debtor's computerized accounting for the Deposited Funds was titled `Client Trust Ledger' (emphasis supplied) and (ii) the very Transfers . . . were made by checks drawn on a `Client Fund Account' (emphasis supplied)." Memorandum Decision at 9.
Significantly, the Bankruptcy Court also held that the Defendants did not have to prove that the Transfers were comprised of their trust assets. In other words, it concluded that the Defendants did not have to trace their trust res to demonstrate that it is still subject to the trust and has not been lost or become subject to any superior rights of a third party. See Restatement (Second) of Trusts § 202 cmts. b and o (1959). It reached this conclusion by determining that "in essence, by making the Transfers, the Debtor traced the funds for the Defendants. There is logically no need to trace when one is in receipt of property identified and acknowledged by a trustee as trust property." Memorandum Decision at 11.
Since the Bankruptcy Court found that the Transfers were payments of funds held in an express trust by the Debtor, it did not address whether the money held by the Debtor was a constructive trust or whether any of the statutory defenses outlined in § 547(c)[3] were applicable.
*600 IV. STANDARD OF REVIEW
Rule 8013 of the Federal Rules of Bankruptcy Procedure determines this Panel's review of a Bankruptcy Judge's judgment, order or decree. Accordingly, a Bankruptcy Court's findings of fact may not be set aside unless clearly erroneous, and a Bankruptcy Court's legal conclusions are reviewed de novo. See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 273 (2d Cir. 1997); H & C Development Group, Inc. v. Miner (In re Miner), 229 B.R. 561, 564 (2d Cir. BAP 1999).
V. DISCUSSION
We hold that the Bankruptcy Court made several mistakes of law that require reversal. The Bankruptcy Court applied the wrong law when it held that the Defendants did not have to trace the Transfers to their particular trust res in order to maintain their priority over other unsecured creditors. It also erred by not applying controlling Connecticut law which prohibits a court from impressing a trust upon an insolvent estate.
We also hold that the Defendants' could not succeed, as a matter of law, with either their ordinary course of business or constructive trust arguments. Therefore, despite the fact that the Bankruptcy Court declined to rule upon these arguments, we are dismissing these claims as part of our authority to review the law as it applies to the facts de novo.
The Bankruptcy Court erred when it held that the Defendants, as trust beneficiaries, are entitled to keep the Transfers. Once the Defendants established a beneficiary-trustee relationship with the Debtor, it was incumbent upon them to prove that the Transfers constituted a specific trust res. We reject the Bankruptcy Court's conclusion that the Debtor segregated, or resegregated the Defendant's money by sending it to them.
Section 547 of the Code enables a trustee in bankruptcy to recover certain payments made by a debtor prior to filing for bankruptcy. The purpose of this section is to further one of the central premises of the Bankruptcy Code, equality of distribution among creditors. See Begier v. I.R.S., 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). Section 547(b) furthers this policy by preventing "the debtor from favoring one creditor over others by transferring property shortly before filing bankruptcy." Id. A trustee, however, may only recover "property of the estate" as that term is defined in § 541 of the Code. See id. at 58-59, 110 S.Ct. 2258; Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 342 (Bankr.S.D.N.Y.1999).
Section 541 of the Code, which is entitled "Property of the estate," provides that the bankruptcy "estate is comprised of . . . all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541 (1998). See Regency Holdings (Cayman) v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 375 (Bankr. S.D.N.Y.1998). Subsection "d" of Section 541 limits the scope of the estate where a debtor held only legal title, as compared with legal and equitable title, to property on the petition date. See 11 U.S.C. § 541; Begier v. I.R.S., 496 U.S. at 59, 110 S.Ct. 2258. Since a "debtor does not own an equitable interest in property he holds in trust for another, that interest is not `property of the estate.'" Begier v. I.R.S., 496 U.S. at 59, 110 S.Ct. 2258. State law determines the extent of an interest in property. See Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); In re Faber's, Inc., 360 F.Supp. 946, 948 (D.Conn.1973).
Here, it is irrelevant whether an express trust had been formed when George gave the money to the Debtor or if the facts dictate that a constructive trust should be impressed upon the Debtor's assets. In either case, under Connecticut law an alleged beneficiary of a trust must trace his property to a particular trust res. See In re Faber's, Inc., 360 F.Supp. at 949-950 (noting that even where a "trustee has violated [a] statutory requirement by *601 commingling . . . funds, if the beneficiary cannot identify his money he will have to take his place at the end of the line behind those favored by the priorities set out in [the Bankruptcy Act]."); Colmark I Ltd. Partnership v. Graubard, Mollen, Horowitz, Pomeranz & Shapiro (In re Colmark Ltd. Partnership), 189 B.R. 253, 256 (Bankr.D.Conn.1995) ("[i]t is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of the wrongdoer." (quoting United States v. Benitez, 779 F.2d 135, 140 (2d Cir.1985))); Breen v. Phelps, 186 Conn. 86, 439 A.2d 1066, 1077-78 (1982) (holding that a party may not impress a constructive trust upon a deceased's estate where he cannot identify and trace the trust res.); Mathewson v. Wakelee, 83 Conn. 75, 75 A. 93, 95 (1910) (holding that a claimant's ability to trace its assets is an "essential condition to the exercise of the right to impress a trust"). See also Sonnenschein v. Reliance Ins. Co., 353 F.2d 935, 936-37 (2d Cir.1965) (concluding that a claimant to trust property held by a bankrupt entity "must assume the burden of ascertaining and tracing the trust property" and where "trust funds . . . cannot be sufficiently identified or traced, the trust beneficiary must prove his claim as a general creditor against the debtor's estate."); Doran v. Treiling (In re Treiling), 21 B.R. 940, 942 (Bankr. E.D.N.Y.1982) (same).
Similarly, courts have imposed the tracing requirement upon persons who have received payments from commingled funds during the preference period. These courts have held that recipients of preferential payments must satisfy common law tracing requirements to the same degree as any other party asserting that it has superior rights to assets held by a debtor. See Daly v. Biafore (In re Carrozzella & Richardson), 237 B.R. 536, 542-43 (Bankr. D.Conn.1999); In re Schick, 234 B.R. at 342-43. See also Taylor Associates v. Diamant (In re Advent Management Corp.), 104 F.3d 293, 296 (9th Cir.1997); First Federal of Michigan v. Barrow, 878 F.2d 912, 915 (6th Cir.1989).
The Supreme Court, in Begier v. I.R.S., implicitly addressed the question of whether the receipt of payments from a commingled account constitutes re-segregation thereby relieving the recipient of having to trace its property. 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). In Begier, the I.R.S. received tax payments from a corporate debtor's general operating account during the ninety-day preference period. The Court was faced with the question of whether or not the payments to the IRS constituted payments from property of the estate, and thereby recoverable by the trustee, or merely IRS assets being held in trust by the debtor, and thereby unrecoverable by him. The Court ultimately decided that the payments constituted trust assets but, because the trust was created by an act of Congress, it had unique attributes unlike common law trusts. The primary attribute that made the trust unique was that the IRS was not required to trace its property. Significantly, the Court based its holding on its interpretation of 26 U.S.C. § 7501 (1998) and not on the fact that the funds had already been transferred to the IRS. Since such a holding, which involved extensive legislative history analysis, is more complicated than the proposition upon which the Bankruptcy Court made its determination, it is reasonable to conclude that the Supreme Court implicitly rejected the notion that the making of payments from a commingled account affects re-segregation.
The Bankruptcy Court, furthermore, cited no authority to support its position that payment constitutes re-segregation, nor did we find any. The reason for the lack of authority is clear. Without a tracing requirement, insolvent trustees who have converted trust assets for their own use would be able to choose, on the eve of bankruptcy, who is to be repaid and who is not. Thus, similarly situated creditors would receive disparate treatment.
*602 For example, in the case at bar, the Debtor took advantage of numerous parties through its scheme. The fact that the Defendants received the payments appears to be their fortuitous request during the preference period for $5,600. There may be other equally deserving "depositors" who did not make a request during the preference period. If the Bankruptcy Court's ruling were to stand, these people would receive less of their money back than the Defendants. Such an outcome is antithetical to the bankruptcy process. See Cunningham v. Brown, 265 U.S. 1, 13, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (stating, in the original "Ponzi" scheme case that, "the principle that equality is equity" is the spirit of the bankruptcy law).
During the trial, the Defendants proffered no evidence indicating that they could trace the Transfers to the money that they gave the Debtor. Once the Trustee established that the Debtor had control of the Account, which he certainly did, by showing that the funds in the Account were used by the Debtor for all manner of expenditures, then the burden of proof shifted to the Defendants to prove (1) that the Debtor had only legal title to the Defendants' money and (2) to trace their interest to their specific property. See In re Schick, 234 B.R. at 343-44. The Defendants did not proffer any evidence during the trial to support either of these conclusions. Given the fungible nature of the asset at issue and the way that the Debtor commingled both investor money and other law firm money, such a task would have been impossible.
In addition to tracing, the Bankruptcy Court overlooked and failed to apply another important and relevant aspect of Connecticut law. Courts in Connecticut have consistently held that a trust should not be impressed upon the assets of an insolvent entity. See McDonald v. Hartford Trust Co., 104 Conn. 169, 132 A. 902, 908 (1926) (stating that where "the trustee's general estate has been enriched by the proceeds of trust property, the trust cannot be impressed upon the general assets where the estate is insolvent."); In re Minton Group, Inc., 28 B.R. at 785. See also State ex rel. Keeler v. Osborn, 69 Conn. 257, 37 A. 491, 492 (1897) (holding that "if [a] trustee in his lifetime wrongfully disposed of the property so that it cannot be found, the claim then is for the wrongful act, and is a claim upon the estate like that of any other creditor."). This rule makes sense in a case, such as this, in which the estate is insolvent and a trustee has commingled trust assets with its own. In such a case, it is simply unfair for a court to impose a trust for the benefit of one creditor over others. Thus, in addition to the fact that the Bankruptcy Court erred by relieving the Defendants of the tracing requirement, it also erred by impressing a trust upon an insolvent, commingled estate.
Once the Bankruptcy Court determined that the Transfers comprised money held in an express trust for the benefit of Christina, it specifically declined to decide whether the Defendants could succeed under either a constructive trust or an ordinary course of business theory. Since all of the relevant facts are before us and the law is clear, we will decide these additional legal issues in lieu of remanding this matter.[4]
A constructive trust argument must fail for the same reason that the express trust theory does. Whether a trust is constructive or express, the party claiming to be a beneficiary must satisfy the common-law tracing requirements. See In re Carrozzella & Richardson, 237 *603 B.R. at 542. Therefore, this defense fails as a matter of law.
The ordinary course of business defense similarly fails. Section 547(c)(2) of the Code provides that a trustee may not avoid a transfer if that transfer was:
(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
(C) made according to ordinary business terms
11 U.S.C. § 547(c)(2).
The purpose of this exception to the section regarding the avoidance of preferential transfers is to "discourage unusual action by either the debtor or his [or her] creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 95-595 at 373 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6329; Lawson v. Ford Motor Co. (In re Roblin Indus.), 78 F.3d 30, 41 (2d Cir. 1996); McCarthy v. Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.), 210 B.R. 27, 34 (N.D.N.Y.1997), aff'd, 142 F.3d 571 (2d Cir.1998); Hassett v. Goetzmann (In re CIS Corp.), 195 B.R. 251, 257 (Bankr.S.D.N.Y.1996); Sapir v. Green Forest Lumber Ltd. (In re Ajayem Lumber Corp.), 145 B.R. 813, 819 (Bankr. S.D.N.Y.1992).
Given the facts presented here, it is difficult to even attempt to apply the factors outlined in the statute. See In re Roblin Indus., 78 F.3d at 39 (emphasizing that in order to assert the ordinary course of business defense, the creditor bears the burden of proving each of the three elements outlined in the statute); In re Vogel Van & Storage, Inc., 210 B.R. at 34 (pointing out that the purpose of § 547(c)(2) is to protect recurring customary credit transactions and normal financial relations paid in the ordinary course of the business of the debtor and the debtor's transferee).
For example, the first element that the Defendants would have had to prove at trial is that the debt to them occurred in the ordinary course of the business or financial affairs of the Debtor and the Defendants. Here, though, George testified that the Debtor was retained to act as an attorney rather than as a bank or an investment service. The debt was incurred not in the ordinary course of the Debtor's business as an attorney, but as an extension of its Ponzi/investment operation. There was no testimony adduced at trial as to the ordinariness of this debt from either the Debtor's or the Defendants' point of view. Thus, the Defendants failed to establish this element of the test.
The second element of the test asks whether the payment at issue was made in the ordinary course of the business or financial affairs of the Debtor and the Defendants. This is a subjective element that requires an examination of whether a transfer was ordinary between the parties to the transfer. See In re Vogel Van & Storage, Inc., 210 B.R. at 34. According George's testimony, it took the Debtor a week to respond to the Defendants' request for the money at issue. George also testified that the week-long delay raised his suspicions about the Debtor's solvency and prompted a call to the Debtor to request a return of all of the money "on deposit." George's testimony, therefore, undercuts any argument the Defendants may make about the ordinariness of the Transfers. Particularly, since there was no testimony adduced during the trial regarding other payments from the Debtor to the Defendants or which might establish the parties' regular course of conduct. Thus, the Defendants failed to establish that the Transfers were ordinary from either party's perspective and, as a result, this element of the test.
The Defendants are also off the mark with respect to the third element. This prong of the test requires a creditor to demonstrate that the terms of the transfer fall within the bounds of normal practice within the subject industry. See id. at 34-35; In re Roblin Indus., Inc., 78 F.3d at 41. Nothing about the Defendants' relationship with the Debtor or the terms by *604 which these transfers were made are normal to any industry, least of all the legal industry. It is unusual for an attorney to also act as investment vehicle for his clients. It is also unusual for an honest attorney to commingle all forms of income regardless of its source. And, honest attorneys never repay one client with funds that are the property of another client. Therefore, as with the other elements of the ordinary course of business defense, the Defendants have failed to establish that the Transfers occurred within the normal bounds of the subject industry. Since the Defendants were unable to prove even one of the three required elements of the ordinary course of business defense, it must be rejected as a matter of law.
Lastly, although the Defendants are the appellees in this appeal, they contend that the Bankruptcy Court's conclusion that the Transfers were on account of an antecedent debt is mistaken. The Defendants argue that because their relationship with the Debtor was in the nature of depositor-depositee or beneficiary-trustee no debt was owed. This unsupported argument is uncompelling and contrary to accepted precedent. See In re Schick, 234 B.R. at 347. Thus, it too must be rejected.
VI. CONCLUSION
We reverse the decision of the Bankruptcy Court because the Bankruptcy Court applied the wrong legal standard when it held that the Defendants, as beneficiaries of a trust fund, did not have to trace their funds in order to maintain their priority over the Debtor's other unsecured creditors. In addition, the Defendants' constructive trust theory and ordinary course defense are rejected.
This matter is hereby remanded to the Bankruptcy Court so that it may enter an appropriate judgment in favor of the Trustee.
So ordered.
NOTES
[1] George, as administrator of the estate of his mother, Christina, was substituted as a party defendant by Order dated December 24, 1997.
[2] The parties' stipulated trial exhibits were not provided to us. The Bankruptcy Court's findings of fact indicate, though, that (a) the checks in question were made payable to "Cristina Radulesco" and (b) there was an indication on the checks that the funds were to drawn upon a "Client Fund Account."
[3] Although there are numerous defenses outlined in § 547(c), the only one which appears to even remotely apply to these facts and the only one which the Defendants argue in favor of in their brief is the ordinary course defense laid out in § 547(c)(2).
[4] The Court of Appeals of the Second Circuit has held that it, and by implication we, have jurisdiction to decide legal matters not resolved by the trial court based upon the record presented to it. See Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 496-97 (2d Cir.2000); Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.), 68 F.3d 26, 30 (2d Cir.1995). See also Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374, 1379 (9th Cir. 1985); Goldberg v. Hilsen (In re Hilsen), 119 B.R. 435, 439 (S.D.N.Y. 1990).