315 B.R. 259 (2004)
In re APP0NLINE.COM, INC., and Island Mortgage Network Inc., et al., Debtors.
Alan M. Jacobs, Chapter 11 Trustee of the Estates of AppOnline.com, Inc., Island Mortgage Network, Inc., and Action Abstract, Inc., Plaintiff,
v.
Matrix Capital Bank, Defendant.
Bankruptcy Nos. 800-84686-478, 800-84687-78, 800-85007-478, 800-85195-478 to 801-85202-478. Adversary No. 802-8261-ess.
United States Bankruptcy Court, E.D. New York.
September 30, 2004.
*266 Kramer Levin Naftalis & Frankel LLP, By Kenneth H. Eckstein, P. Bradley O'Neill, New York, for the Chapter 11 Trustee.
Wachtel & Masyr, LLP, By Steven J. Cohen, New York, for Matrix Capital Bank.

MEMORANDUM DECISION GRANING IN PART CHAPTER 11 TRUTEE'S MOTION FOR SUMMARY JUDGMENT ON FIRST COUNT OF COMPLAINT AND DENYING MTRIX CAPITAL BANK'S MOTION FOR SUMMARY JUDGMENT
ELIZABETH S. STONG, Bankruptcy Judge.
This adversary proceeding was commenced by the filing of a complaint (the "Complaint") by Alan M. Jacobs as Chapter 11 Trustee (the "Trustee") of the estates of AppOnline.com, Inc., Island Mortgage Network, Inc., and Action Abstract, Inc. ("AppOnline," "Island Mortgage," and "Action Abstract" or the "Debtors") to avoid and recover prepetition transfers totaling $6,166,396 (the "June Repayments," as defined below) made by the Debtors to Matrix Capital Bank ("Matrix"), on grounds that the June Repayments are preferential or fraudulent transfers. *267 The Trustee moves for summary judgment on the First Count, which seeks to recover the June repayments as avoidable preferential transfers.[1] Matrix moves for summary judgment on its counterclaim for a declaration that the June Repayments are not property of the Debtors' estates and dismission the Trustee's preference and fraudulent conveyance claims or, alternatively, a declaration that the June Repayment are protected from avoidance under the ordinary course of business exception set forth in 11 U.S.C. § 547(c)(2).
The matter came before the Court on May 13, 2004, at which counsel for the Trustee and Matrix appeared and were heard. After consideration of the submissions, the arguments of counsel, and the record before the Court, for the reasons set forth below, the Trustee's Motion for Summary Judgment is granted in part, and Matrix's Motion for Summary Judgment is denied.

JURISDICTION
This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(F). The following constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rule 7052.

FACTUAL BACKGROUND

A. Procedural History
On July 19, 2000 (the "Petition Date"), AppOnline and Island Mortgage filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On July 20, 2000, certain of Island Mortgage's creditors (the "Petitioning Creditors") moved for an order appointing a trustee for these Chapter 11 cases under 11 U.S.C. §§ 1104(a)(1) and (2). By order dated July 28, 2000, the United States Trustee appointed the Trustee as Chapter 11 trustee of AppOnline and Island Mortgage. On July 28, 2000, the Petitioning Creditors filed an involuntary Chapter 11 petition in the name of Action Abstract, and on August 22, 2000, the Court entered an order for relief under Chapter 11 in respect of Action Abstract. By order dated September 19, 2000, the United States Trustee appointed the Trustee as Chapter 11 trustee of Action Abstract.
On July 3, 2001, the Trustee moved for an order substantively consolidating the estates of the Debtors for all purposes, nunc pro tunc to July 19, 2000, on grounds that prior to the Petition Date, the Debtors' businesses were operated as a single consolidated entity and their assets were hopelessly commingled. On September 7, 2001, the Court entered an order substantively consolidating the Debtors' estates.

B. The Debtors' Business

Prior to the Petition Date, AppOnline was a holding company that, through its subsidiaries, operated a mortgage banking business. Island Mortgage, a whollyowned subsidiary of AppOnline, was a licensed mortgage banker which originated and sold residential mortgage loans. Declaration of Regina Jones dated February 23, 2004 ("Jones Decl."), ¶ 2. Island Mortgage obtained consumer applications for residential mortgage loans through its *268 website and a network of retail branches. Jones Decl. ¶3. The majority of these mortgage loans were funded by several warehouse banks with which Island Mortgage maintained financing agreements. Id.
Island Mortgage arranged for funding of a mortgage loan from a warehouse bank by sending the warehouse bank a package of mortgage-related documents a day or two before the scheduled closing. Jones Decl. ¶4. If the mortgage loan met the requirements of the warehouse bank, the bank transferred ninety-five to one hundred percent of the principal amount of the mortgage loan to the Debtors. Id. If the warehouse bank delivered less than the full amount, the difference, referred to as the "haircut," was advanced by the Debtors. Declaration of Cindy Eisele dated February 21, 2004 ("Eisele Decl"), It ¶5. After receiving these funds, the Debtors forwarded documents executed by Island Mortgage and a check in the amount of the mortgage loan to the closing agent. Jones Decl. ¶6.
If the mortgage loan closed, then the closing agent transmitted the original promissory note executed by the borrower to the warehouse bank to hold as collateral. Id. Island Mortgage also obtained a commitment from a permanent investor to purchase the mortgage from it. Jones Decl. ¶7.After the mortgage loan closed, if the permanent investor decided to purchase the mortgage, it paid the purchase price to the warehouse bank. Id. The warehouse bank then deducted the principal balance of the loan it made to Island Mortgage, together with interest, fees and charges, and deposited the balance in an account in the name of Island Mortgage. Id.
If the mortgage loan did not close, the Debtors returned the funds advanced by the warehouse bank, together with interest, fees, and charges on the advance. Jones Decl. ¶8. The number of days that the funds remained at the Debtors varied, depending on, among other things, the requirements of the warehouse bank that made the advance and the thoroughness with which the warehouse bank monitored those requirements. Id.
Action Abstract was a settlement agent and title abstract company for mortgage transactions originated by Island Mortgage. Declaration of Cindy Eisele in Connection with Trustee's Motion for an Order Pursuant to Section 105 of the Bankruptcy Code Authorizing Substantive Consolidation of the Debtors' Estates dated June 13, 2001 ("Eisele 2001 Decl."), ¶14. Action Abstract received funds from warehouse banks and arranged for those funds to be delivered at the closing. It was owned by a director of AppOnline. Eisele 2001 Decl. ¶¶ 14,15.
Action Abstract's bank accounts, including its operating account and the principal settlement account used to receive funds from warehouse lenders, were maintained at State Bank of Long Island ("State Bank") and were part of Island Mortgage's group account arrangement. Eisele 2001 Decl. ¶15. Island Mortgage personnel had access to and authority over these accounts and routinely transferred funds from Action Abstract accounts to accounts of other Debtors without regard to corporate or legal formalities, based upon the cash needs of the particular Debtor. Eisele 2001 Decl. ¶¶ 13,15.
Beginning in mid-1999, Island Mortgage directed its warehouse banks to deliver funds to an Action Abstract account at State Bank (the "Settlement Account"). Jones Decl. ¶5. On a regular basis, Island Mortgage employees transferred funds delivered to the Settlement Account by warehouse banks to disbursement accounts to fund mortgage closings. Eisele 2001 Decl. *269 ¶16. Island Mortgage employees also used Settlement Account funds to pay off earlier warehouse advances and to pay operating expenses and cover shortfalls in the Debtors' other accounts. Id.
Almost from the outset of their operations, the Debtors were not able to fund the "haircut" or pay their operating and other expenses. Eisele 2001 Decl. ¶¶ 16, 17; Supplemental Declaration of Cindy Eisele dated April 1, 2004 ("Eisele Supp. Decl."), ¶ 3. From 1996 or earlier and continuing through June 30, 2000, when the New York State Banking Department suspended the Debtors' mortgage banking operations, the Debtors financed their operations through a pattern of multiple borrowings from warehouse banks. Eisele Decl. ¶ 7. The Trustee characterizes the Debtors' borrowings as a variant of a traditional "Ponzi" scheme. Trustee's S.J. Br. at 7.
The Debtors adopted a practice of regularly representing to their warehouse banks that specific mortgage loans were ready to close when, in fact, many of those loans were not ready to close. Eisele Decl. ¶ 6. Based on the Debtors' representations, the warehouse banks advanced funds to the Debtors to fund these mortgage loans. The Debtors used the funds for many purposes, including to fund the closing of other mortgage loans, to repay amounts advanced in connection with other mortgage loans, and to pay the operating expenses of the Debtors and related companies. Id. When the time came to repay the advance by the warehouse bank, the Debtors represented to another warehouse lender that a separate loan was ready to close and used the resulting advance to repay the first warehouse advance. Id. By the time the Debtors' mortgage banking operations were closed down by regulators in June 2000, more than $60 million in warehouse advances was missing. Declaration of Alan M. Jacobs dated February 23, 2004 ("Jacobs Decl."), ¶ 8.

C. The Debtors' Relationship with Matrix

Matrix, a federally chartered bank centered in Las Cruces, New Mexico, buys and sells residential mortgages. Affidavit of Patrick Howard, dated February 12, 2004 ("Howard Aff.") ¶¶ 3-4. On January 12, 2000, Island Mortgage contracted with Matrix to provide warehouse funding[2] for the Debtors' mortgage banking business. Jones Decl. ¶ 9. The parties executed a Mortgage Purchase/Repurchase Agreement (the "Agreement") which established a $25 million purchase/repurchase line under which Matrix agreed to purchase mortgage loans from Island Mortgage, *270 within five days of closing, up to a total outstanding amount of $25 million, subject to Island Mortgage's obligation to repurchase the mortgage within the following forty-five days. Jones Decl. Exh. A (Agreement).
The Agreement did not address what happened if the underlying mortgage did not close. Id. Over the six months that Matrix did business with Island Mortgage, the underlying mortgage did not close in approximately two-thirds of the transactions in which Matrix advanced funds to Island Mortgage. Jones Decl. ¶ 9; Declaration of Francine Azzariti dated February 23, 2004 ("Azzariti Decl."), ¶ 2. The Agreement provided for Matrix to receive a "premium" equal to the then-prevailing prime rate of interest plus one percent on the total amount advanced for the period that it was outstanding. Jones Decl. ¶ 9, Exh. A (Agreement) ¶ 5.01. Matrix collected these amounts by debiting a bank account held in the name of Island Mortgage at Matrix (the "Concentration Account"). Id. Matrix collected over $375,000 in premiums and $19,450 in fees on transactions in which the underlying mortgage did not close. Azzariti Decl. ¶ 2.

D. The Alleged Preferential Transfers

Between May 26 and June 8, 2000, Island Mortgage represented to Matrix that fifty-three loans were ready to close. Jones Decl. ¶ 11, Exh. B (payment/repayment data). Based upon these representations and documentation submitted by Island Mortgage, Matrix wired a total of $6,166,396 to the Debtors to fund the mortgages (the "June Advances"). Id. More specifically, between May 26 and June 1, 2000, Matrix wired $1,765,025 to the Debtors; on or about June 2, 2000, Matrix wired $1,157,067 to the Debtors; on or about June 6, 2000, Matrix wired $1,778,105 to the Debtors; on or about June 7, 2000, Matrix wired $985,221 to the Debtors; and on or about June 8, 2000, Matrix wired $480,978 to the Debtors. Id. Following Island Mortgage's instructions, these amounts were directed to the Settlement Account. Jones Decl. ¶ 11.
None of the fifty-three mortgage loans associated with the June Advances closed. Jones Decl. ¶¶ 12-17. The June Advances were used by the Debtors to fund other mortgage loans, to repay advances made by other warehouse lenders relating to different mortgage loans, and to pay the Debtors' operating expenses. Eisele Decl. ¶ 6.
On June 6, 2000, Matrix terminated the Agreement, effective June 16, 2000. Between June 8 and June 23, 2000, the Debtors wired a total of $6,166,396 to Matrix to repay the amounts that Matrix advanced to fund the fifty-three mortgages that did not close. Specifically, on June 8, 2000, the Debtors wired $1,561,595 to Matrix (the "June 8 Repayment"); on June 14, 2000, the Debtors wired $481,466 to Matrix (the "June 14 Repayment"); on June 15, 2000, the Debtors wired $1,046,277 to Matrix (the "June 15 Repayment"); on June 16, 2000, the Debtors wired $490,914 to Matrix (the "June 16 Repayment"); on June 20, 2000, the Debtors wired $402,518 to Matrix (the "June 20 Repayment"); and on June 23, 2000, the Debtors wired $2,183,616 to Matrix (the "June 23 Repayment" and collectively, the "June Repayments"). Jones Decl. ¶¶12-13, Exh. B (payment/repayment data).

DISCUSSION

A. The Standard for Summary Judgment
The Trustee and Matrix each seek summary judgment on some or all of their claims. Federal Rule of Civil Procedure 56, made applicable to this adversary *271 proceeding by Bankruptcy Rule 7056, provides that summary judgment is appropriate when "`the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247^8, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences." Hassett v. Altai Inc. (In re CIS Corp.), 214 B.R. 108, 118 (Bankr.S.D.N.Y. 1997).
The moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all of the inferences to be drawn from the underlying facts must be viewed by the Court in the light most favorable to the party opposing the motion. See Anderson, All U.S. at 249, 106 S.Ct. 2505. To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, A15 U.S. at 586, 106 S.Ct. 1348. Rather, it must present "significant probative evidence" that a genuine issue of fact exists. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of fact for trial and summary judgment is appropriate. Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), cert. denied, ___ U.S. ___, 124 S.Ct. 53,157 L.Ed.2d 24 (2003).

B. The Summary Judgment Motions on the First Count of the Complaint

One of the fundamental principles of bankruptcy law is the equality of distribution of the debtor's property to creditors who are similarly situated. As the Supreme Court observed:
Equality of distribution among creditors is a central policy of the Bankruptcy Code. According to that policy, creditors of equal priority should receive pro rata shares of the debtor's property. Section 547(b) furthers this policy by permitting a trustee in bankruptcy to avoid certain preferential payments made before the debtor files for bankruptcy. This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for bankruptcy.
Begier v. IRS, 496 U.S. 53, 58, 110 S.Ct. 2258,110 L.Ed.2d 46 (1990) (citations omitted). The intent of the parties to a transfer is not determinative. Rather, "[because a `preference is an infraction of the rule of equal distribution among all creditors,'... neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b)." Corporate Food Mgmt, Inc. v. Suffolk Cmty. Coll. (In re Corporate Food Mgmt, Inc.), 223 B.R. 635, 641 (Bankr.E.D.N.Y. 1998) (quoting Cullen Center Bank & Trust v. Hensley (In re Criswell), 102 F.3d 1411,1414 (5th Cir.1997)).
The Trustee claims that as a matter of law and undisputed fact, the June Repayments satisfy each of the elements of a preferential transfer. These elements are set forth in Section 547(b) of the Bankruptcy Code as follows:

*272 [T]he trustee may avoid any transfer of an interest of the debtor in property
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
11 U.S.C. §§ 547(b)(1)-(5).
"The Trustee bears the burden of proving each of these elements by a preponderance of the evidence." Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 34 (2d Cir.1996) (citations omitted). If the Trustee "puts forth sufficient proof to establish a prima facie preference, the burden shifts and the creditor is given the opportunity to establish by a preponderance of the evidence that one of the enumerated exceptions in 11 U.S.C. § 547(c) applies." Child World, Inc. v. Service Merch. Co. (In re Child World, Inc.), 173 B.R. 473, 476 (Bankr.S.D.N.Y. 1994) (citations omitted). The Court considers each of these elements in turn.

Were the June Repayments transfers of interests of the Debtors in property?
The Court first considers whether the June Repayments were each a "transfer of an interest of the debtor in property." 11 U.S.C. § 547(b). See Begier, 496 U.S. at 58,110 S.Ct. 2258 (avoidance power is limited to transfers of "property of the debtor"). As one court explained, "[a] preference action is designed to recover property that would have been available for distribution to the creditor body but for the transfer. Conversely, property that would not have been property of the estate cannot be recovered." Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.), 216 B.R. 371, 375 (Bankr. S.D.N.Y.1998) (citation omitted).
The Bankruptcy Code defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, ...." 11 U.S.C. § 101(54). But the Bankruptcy Code does not define the phrase "interest of the debtor in property." As the Fifth Circuit observed:
Other courts that have addressed this dilemma, including the United States Supreme Court, have concluded that "the term `interest of the debtor in property' under § 547(b) is ... equivalent to the term `property of the estate' under § 541 and therefore encompasses `all legal or equitable interests of the debtor in property as of the commencement of the case.'"
In re Corporate Food Mgmt, Inc., 223 B.R. at 642 (quoting Cullen Center Bank & Trust v. Hensley (In re Criswell), 102 F.3d 1411, 1415 (5th Cir.1997)). See Begier, 496 U.S. at 58-59, 110 S.Ct. 2258 ("For guidance, then, we must turn to § 541, which delineates the scope of `property of the estate' and serves as the post-petition analog to § 547(b)'s `property of the debtor'").
"Property of the estate" is described in Section 541 of the Bankruptcy Code as follows:

*273 (a) The commencement of a case ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(1) ... [A]ll legal and equitable interests of the debtor in property as of the commencement of the case.
...
(d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
11 U.S.C. §§ 541(a)(1), (d).
The Trustee argues that the June Repayments were "transfers of an interest of the debtor in property" because the June Repayments were made from the Settlement Account, which was held in the name of Action Abstract, to Matrix. Jones Decl. ¶ 5, 12-17. Thus, the Trustee asserts, the June Repayments "clearly represent a transfer of an interest of Action Abstract in property." Trustee's S.J. Br. at 16, citing Jones Decl. ¶ 11. The Trustee also asserts that the June Repayments were transfers of property interests of the Debtors other than Action Abstract because the Debtors' estates have been substantively consolidated. Id. The Trustee further asserts that the preference claim stands on its own even if asserted solely by the estate of Action Abstract. Reply Memorandum of Law in Further Support of Trustee's Motion for Summary Judgment on First Count of Complaint dated April 16, 2004 ("Trustee's Reply Br."), at 7-8.
Matrix seeks summary judgment on its counterclaim for a declaration that the June Repayments were made from trust funds belonging to Matrix and rightly returned to it when the underlying mortgages that those funds intended to purchase did not close. Matrix claims that the funds it advanced to Action Abstract were held for its benefit in escrow, a constructive trust, or a resulting trust. Reply Memorandum in Further Support of Matrix Capital Bank's Motion for Summary Judgment dated April 15, 2004 ("Matrix Reply Br."), at 11-14.
Matrix claims that during the course of the parties' relationship, it purchased and resold several thousand loans through "wet" funding.[3] Howard Aff. ¶ 26. Matrix argues that it delivered funds to Action Abstract as closing agent, intending that the funds be held in escrow and delivered to Island Mortgage only if the underlying mortgage loan closed and Matrix received a note and mortgage in exchange. Memorandum of Defendant Matrix Capital Bank in Opposition to the Trustee's Motion for Summary Judgment dated April 2, 2004 ("Matrix Opp. Br."), at 2. Matrix asserts that in each case it advanced funds with the contractual understanding that the funds were earmarked for a single and exclusive purpose: the purchase of the approved loan. Howard Aff. ¶¶ 28-29; Matrix Notice of Motion for Summary Judgment dated February 12, 2004 ("Matrix S.J. Notice") Exh. 11 (HUD-1 reports). Matrix argues that since this purpose *274 was known to both Action Abstract and Island Mortgage, they received those funds in trust, and had neither legal nor equitable authority to treat the funds as their own. Matrix Opp. Br. at 2-3.
Matrix's argument that the funds that it advanced to Action Abstract were held in an escrow or express trust does not carry the day, for several reasons. Under New York law,[4] to establish an escrow arrangement "there must be a written agreement under which the grantor deposits property with and relinquishes control to an escrowee with the subsequent delivery of the property by the escrowee to the grantee conditioned upon the happening of some event." Doran v. Treiling (In re Treiling), 21 B.R. 940, 943 (Bankr. E.D.N.Y.1982). See also George A. Fuller Co. v. Alexander & Reed Esqs., 760 F.Supp. 381, 386 (S.D.N.Y.1991). Put another way, an escrow arrangement requires "a valid contract and absent such a contract the mere delivery of the instrument or property to an escrowee does not constitute a transaction in escrow." National Union Fire Ins. Co. Pittsburgh, Pa. v. Proskauer Rose Goetz & Mendelsohn, 165 Misc.2d 539, 545, 634 N.Y.S.2d 609, 614 (Sup.Ct. N.Y. County 1994), aff'd, 227 A.D.2d 106, 642 N.Y.S.2d 505 (1st Dep't 1996). A proponent "must also show the alleged escrow agent agreed to accept that responsibility." Friedman v. Stern, 1992 WL 58878, *2 (S.D.N.Y.1992).
Similarly, "[a]n express trust is `a fiduciary relationship with respect to property, subjecting the person by whom the title to property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.'" LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), 274 B.R. 600, 623 (Bankr. S.D.N.Y.2002) (quoting RESTATEMENT (SECond) OF TRUSTS § 2 (1959)), affd, 2004 WL 1948754 (S.D.N.Y.2004). Under New York law, an express trust requires (i) a designated beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (iv) the actual delivery or legal assignment of the fund or other property to the trustee with the intention of passing legal title to him or her as trustee. In re Ames Dep't Stores, Inc., 274 B.R. at 623.
Here, the record does not show that the parties entered into a written agreement providing that funds wired by Matrix to the Settlement Account would be held in escrow or trust by Action Abstract. The only documentation of the parties' arrangements is the Agreement, which does not provide for an escrow arrangement or other express trust. Jones Decl. Exh. A (Agreement) 114.01. Rather, the Agreement requires only that Matrix advance money "to [Island Mortgage] in accordance with [Island Mortgage's] wiring instructions...." Id.
In response, Matrix offers the affidavit of its Executive Vice President and Chief Operating Officer, Patrick Howard, who states that "Matrix sent these funds with *275 the understanding that they would be held in escrow until the closing of the mortgage loan, when they would be conveyed to the closing agent and disbursed as appropriate." Howard Aff. ¶ 28. Matrix also offers expert testimony to the effect that "standard industry practice" requires that such funds be deposited in escrow. Martinez Aff. ¶ 8, 30.
As New York law makes clear, neither the "understanding" of Matrix's executives nor "standard industry practice" is sufficient to overcome the requirement that a binding escrow agreement be in writing, or that an entity agreed to assume the responsibilities of an escrow agent, or that any of the elements of an express trust were met: Rather, the record shows the following.
 Matrix did not agree, orally or in wilting, that funds advanced by Matrix would be held in escrow by Action Abstract. Supplemental Declaration of Alan M. Jacobs dated April 2, 2004 ("Jacobs Supp. Decl."), Exh. D (testimony of Patrick Howard) at 84:22-85:6; Exh. H (testimony of Christine Harris) at 70:14-25; Exh. F (testimony of Yolanda Byford) at 52:20-23.
 When it advanced funds to Action Abstract, Matrix did not give written or oral instructions as to how the funds were to be handled, or direct that they were to be held in escrow or trust. Jacobs Supp. Decl. Exh. H (testimony of Christine Harris) at 70:7-13, 71:5-11; Exh. I (testimony of Christine Harris) at 89:2-90:8; Exh. E (testimony of Patrick Howard) at 129:2-130:4; 174:3-175:6.
 Action Abstract did not represent to Matrix that the Settlement Account was an escrow account. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 91:2-7.
 Island Mortgage did not represent to Matrix that Action Abstract was an independent third party closing agent with an escrow account to receive the funds. Jacobs Supp. Decl. Exh. E (testimony of Patrick Howard) at 185:9-186:6; Exh. I (testimony of Christine Harris) at 90:19-91:19; Exh. G (testimony of Yolanda Byford) at 108:25-109:21.
 The Settlement Account was denominated a "settlement account," not an escrow or trust account. Jacobs Decl. Exh. J (Action Abstract Settlement Account bank statement).
 The Settlement Account was not used as an escrow or trust account. Eisele 2001 Decl. HH 13-16; Eisele Decl. ¶¶ 2-5; Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 106:2-6; 104:14-105:25.
 Matrix assumed that funds would be deposited by Action Abstract in a real estate escrow account. Jacobs Supp. Decl. Exh. E (testimony of Patrick Howard) at 129:24-133:17; Exh. I (testimony of Christine Harris) at 100:22-101:10.
Accordingly, the record does not support Matrix's claim that an escrow agreement or other express trust arrangement existed between Matrix and any of the Debtors, including Island Mortgage and Action Abstract. To the contrary, the record shows that no such agreement was in place. See Ellis v. Provident Life & Accident Ins., 3 F.Supp.2d 399, 409 (S.D.N.Y.1998) (contract may not be implied in fact where facts are inconsistent with its existence), affd, 172 F.3d 37 (2d Cir.1999).
Matrix's argument that the funds that it advanced to Action Abstract were held in a resulting trust or constructive trust is similarly not persuasive. Under New York law, a resulting trust arises "`(1) where an express trust fails in whole *276 or in part; (2) where an express trust is fully performed without exhausting the trust estate; (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person.'" Saulia v. Saulia, 31 A.D.2d 640, 640, 295 N.Y.S.2d 980, 982 (2d Dep't 1968) (quoting 4 SCOTT ON TRUSTS § 404.1 (2d ed.) (1956)). A resulting trust "can be established only by clear, unequivocal and convincing evidence, especially when parol evidence is relied upon." Schmitz v. Schmitz, 234 A.D. 73, 77, 254 N.Y.S. 109, 114 (1st Dep't 1931). As described above, the record does not show that an escrow or express trust existed, or failed, between Matrix and Action Abstract or any of the Debtors.
The record also does not show that a constructive trust was established. The elements of a constructive trust under New York law are: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." Koreag, Controle et Revision S.A. v. Refco F/X Assoc., Inc. (In re Koreag), 961 F.2d 341, 352 (2d Cir.1992), cert, denied, 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992). Matrix has not shown that "a confidential or fiduciary relationship" existed between Matrix and the Debtors. Rather, the Agreement and the parties' course of dealings shows that Matrix and the Debtors were engaged in a commercial relationship to fund mortgage loan transactions. As noted by the Second Circuit, "[pjurely commercial transactions do not give rise to a fiduciary relationship." In re Koreag, 961 F.2d at 353.
Even if the record established that the June Advances were held in an escrow or trust account, Matrix would face another hurdle that it cannot overcome. The record shows that funds advanced by Matrix to the Settlement Account were commingled with funds from the Debtors and other warehouse banks. Jacobs Supp. Decl. ¶ ¶ 2-3; Jacobs Decl. Exh. F (Complaint, Household Commercial Financial Services, Inc. v. Action Abstract, Inc.) at ¶ 61. It is well-settled that a claimant to trust property held by a debtor must be able to trace its funds in order to lay claim to property of the debtor. Where funds cannot be traced, priority over unsecured creditors cannot be sustained:
As the Second Circuit explained in a different context: "[P]roperty converted, embezzled, or otherwise taken by the bankrupt, or obtained by him by fraud, can be claimed from the bankrupt estate only so long as it can be definitely traced, with the consequence that an attempted repayment by the bankrupt prior to bankruptcy is a preference, except when made from the very property taken .... The rule applies even to property which the bankrupt had held in trust."
Cassirer v. Herskowitz (In re Schick), 234 B.R. 337, 343 (Bankr.S.D.N.Y.1999) (citations omitted) (quoting Morris Plan Indus. Bank v. Schorn, 135 F.2d 538, 539 (2d Cir.1943)). See also Danning v. Bozek (In re Bullion Reserve of North America), 836 F.2d 1214, 1218 (9th Cir.1988) ("even if an express trust were created, [the defendant] would still have a duty under federal bankruptcy law to trace his funds to the [payment] he received"), cert. denied, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); First Fed. of Mich. v. Barrow, 878 F.2d 912, 915 (6th Cir.1989) ("any party seeking to impress a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form"); Daly v. Radulesco (In re Carrozzella & Richardson), 247 B.R. 595, 600 (2d Cir. BAP 2000) ("[o]nce the defendants established [an express] beneficiary-trustee relationship with *277 the Debtor, it was incumbent upon them to prove that the transfers constituted a specific trust res.").
Put another way, if funds are commingled, then even the existence of an escrow or other express trust will not protect the beneficiary in a preference action, because the very fact of commingling shows that the debtor had the ability to control the disposition of the funds at issue. As the court in In re Schick further observed:
Ordinarily, a bankruptcy trustee must demonstrate that the debtor had legal title to a bank account and control over its use, including paying his own creditors.... In the case of commingled accounts, the bankruptcy trustee's burden of proof is affected by the beneficiary's burden to trace. The funds in a commingled account maintained in the debtor's name may be used to pay his unsecured creditors unless a beneficiary can trace his or her superior right in the funds. Thus, the law implies the element of "control" in the absence of tracing. Accordingly, the bankruptcy trustee carries her burden of proving that the account was property of the debtor by showing that the debtor had legal title to the account, and the account consists of commingled trust and personal funds.
In re Schick, 234 B.R. at 343.
The record shows that the Debtors had legal title to the Settlement Account, which was held in the name of Action Abstract and controlled by Island Mortgage. Matrix does not identify a trust res to support the existence of an asserted trust, whether express, resulting, or constructive, and does not trace the June Repayments directly to any such res. Accordingly, Matrix's escrow and trust theories do not overcome the Trustee's claim that the June Repayments were "transfers of an interest of the [Debtors] in property."
Finally, Matrix argues that to the extent that the Debtors exercised "control" over the funds in the Settlement Account, they did so fraudulently. Matrix S.J. Br. at 18-20. Matrix argues that the Debtors' estate should not be augmented by property obtained by the Debtors' fraud. Id. Thus, Matrix argues, the June Advances did not become property of the Debtors' estate, and the June Repayments cannot be recovered through the Trustee's preference claim. Id. But as discussed above, Matrix's burden to establish the existence of an escrow or trust, and to trace the June Repayments back to the June Advances, is not diminished because it contends that the Debtors committed fraud. In re Schick, 234 B.R. at 343. See p. 276, supra.
In sum, the Court concludes that the Trustee has established that the June Advances were property of the Debtors' estates, and therefore, that the June Repayments made from the commingled Settlement Account were transfers of interests of the Debtors in property. The Court also concludes that Matrix has not established that the June Advances were made pursuant to an escrow or an express, resulting, or constructive trust. The Court further concludes that Matrix has not shown that it can trace the June Repayments to the June Advances. As a result, the Court concludes that the June Repayments were transfers of interests of the Debtors in property under Section 547(b) of the Bankruptcy Code.

Is Matrix a creditor that was owed an antecedent debt by the Debtors?
The Court next considers whether Matrix is a "creditor" that was owed an "antecedent debt" by the Debtors before the June Repayments were made. 11 U.S.C. §§ 547(b)(1), (b)(2). The term *278 "antecedent debt" is not defined in the Bankruptcy Code. But the term "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). The Supreme Court observed that "[t]his definition reveals Congress' intent that the meanings of `debt' and `claim' be coextensive." Pennsylvania Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). A "claim" is defined in the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). It is well-settled that "the term `claim' is sufficiently broad to encompass any possible right to payment." Mazzeo v. United States (In re Mazzeo), 131 F.3d 295, 302 (2d Cir.1997). Thus, "[w]hen a creditor has a claim against the debtor, the debtor owes a debt to the creditor." In re Bullion Reserve of North America, 836 F.2d at 1219.
The Trustee argues that Matrix's delivery of the June Advances created a "claim" by Matrix against the Debtors for return of those funds or delivery of a promissory note executed in connection with the underlying mortgages. Trustee's S.J. Br. at 14. The Trustee asserts that because the underlying mortgages corresponding to the June Advances did not close, "Matrix undoubtedly had a `right to payment' of the amounts advanced, whether under the terms of the [Agreement] or under general principles of law." Id.
The Trustee also argues that Matrix has asserted multimillion dollar claims based on fraud, breach of contract, and other theories, to recover funds that it advanced to Island Mortgage and Action Abstract to fund mortgages that did not close. See Jacobs Decl. Exh. F (Complaint, Household Commercial Financial Services, Inc. v. Action Abstract, Inc.); Exh. G (list of adversary proceedings brought by the Trustee). Therefore, the Trustee argues, since Matrix would have had "claims" against Island Mortgage and Action Abstract to recover the June Advances if the June Repayments had not been made, Island Mortgage and Action Abstract owed Matrix a "debt" under the Bankruptcy Code. Trustee's S.J. Br. at 14. Because Matrix holds "claims" against Island Mortgage and Action Abstract, it is a "creditor" of Island Mortgage and Action Abstract. See 11 U.S.C. § 101(10)(A) ("creditor means(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor").
The Trustee further argues that Matrix is a "creditor" and the June Advances created an "antecedent debt" because the June Advances may be viewed as unsecured loans from Matrix to Island Mortgage. Trustee's S.J. Br. at 14-15. The Trustee claims that Matrix delivered the June Advances to Island Mortgage and Action Abstract with the understanding that the funds would be repaid with interest if the underlying mortgage loans did not close. Id. When the funds were not repaid within the time period Matrix required, Matrix demanded and received prompt repayment, with interest based upon the length of time that the advance was outstanding. Jones Decl. ¶ 9. The Trustee asserts that these facts demonstrate that the June Advances were unsecured loans. Trustee's S.J. Br. at 15. See In re Grand Union Co., 219 F. 353, 356 (2d Cir.1914) ("[a] loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrow[ed]"), cert, denied, 238 U.S. 626, 35 S.Ct. 664, 59 L.Ed. 1495 (1915); BLACK'S LAW DICTIONARY 646 (6th ed.1991) (a loan is "[d]elivery by one party *279 to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest").
Matrix argues that it is not a "creditor" of the Debtors that was owed an "antecedent debt," for three reasons. First, Matrix argues that it is not a "creditor" for preference purposes because it was a "purchaser" of mortgages rather than a "lender" to the Debtors. Matrix S.J. Br. at 5-7, 9-10. Second, Matrix argues that it is not a "creditor" because the June Advances were to be held in escrow or trust by Action Abstract on its behalf. Matrix S.J. Br. at 15-18. Finally, Matrix argues that Island Mortgage's payment of fees for the period that Matrix's funds were held by Action Abstract does not establish that the funds advanced by Matrix were "loans." Matrix Opp. Br. at 10-11.
The Court first considers Matrix's argument that it is not a "creditor" because it is a "purchaser" rather than a "lender." Matrix urges that under the Agreement, "it purchased and resold several thousand such loans, all through `wet' funding." Matrix S.J. Br. at 6, citing Howard Aff. ¶ 26. Matrix asserts that in each case, it received and reviewed loan documentation prior to approving the purchase. Id., citing Howard Aff. ¶ 27. Matrix further asserts that following approval of the loan, Matrix wired funds to Action Abstract to purchase the loan with the "contractual understanding that the funds were earmarked for a single and exclusive purpose: the purchase of the approved loan." Matrix S.J. Br. at 6.
But Matrix's arguments do not take account of the broad definitions set forth in Section 101 of the Bankruptcy Code. As other courts have found, whether Matrix is a "purchaser" or a "lender" does not determine whether Matrix is a "creditor" of the Debtors that was owed an "antecedent debt" for preference purposes. For example, in In re Bullion Reserve of North America, the debtor represented itself to be in the business of purchasing bullion for the public through a member account program. In re Bullion Reserve of North America, 836 F.2d at 1216. Rather than purchasing the bullion, the debtor commingled the funds that it received from program participants and used them to pay various expenses, including its costs of general operation. Id. One of the participants closed his account and received over $200,000 of bullion from the debtor fortytwo days before the debtor filed for Chapter 11 relief. Id. The trustee sought to recover the bullion as a preferential transfer. Id.
The participant argued that he was an "investor" rather than a "creditor" and that the transfer was not on account of an "antecedent debt" because the debtor did not owe him anything before making the bullion transfer. 836 F.2d at 1218. The Ninth Circuit rejected these arguments on grounds that under the Bankruptcy Code's definitions of "creditor" and "claim":
[the participant] became a creditor when he transferred funds to [the debtor] for the purchase of bullion. At that moment, [the participant] accrued a right to demand bullion from [the debtor]. This right, although unmatured, constituted a "claim" under the Bankruptcy Code.
836 F.2d at 1218. The court also observed that the term " `debt' is defined as a `liability on a claim,' " and that "the terms `debt' and `claim' are coextensive." 836 F.2d at 1219. The court concluded:
When a creditor has a claim against the debtor, the debtor owes a debt to the creditor.... [The participant] accrued a claim against [the debtor] when he paid for the bullion. Likewise, [the debtor] incurred a debt to [the participant] as of this time. Therefore, the subsequent *280 transfer of bullion was on account of an antecedent debt.
Id.
A similar analysis was made by the Fifth Circuit in Cohen v. Barge (In re Cohen), 875 F.2d 508 (5th Cir.1989). There, the court held that an investor who was defrauded by the debtor was a creditor for preference purposes. The court held:
Regardless whether [the investor's] transactions with [the debtor] create claims in the nature of contract ... or in fraud, they are nevertheless claims as defined by the Bankruptcy Code.... [the debtor's] repayment of funds to [the investor] up to the $2.3 million that [the investor] invested with [the debtor] were for or on account of an antecedent debt.
875 F.2d at 509.
The Court next considers Matrix's argument that it is not a creditor because the June Advances were to be held in escrow or trust by Action Abstract on its behalf. As discussed above, Matrix has not established that the June Advances were made pursuant to an escrow or an express, resulting, or constructive trust. See pp. 275-77, supra. And even if the June Advances were held in escrow, the Bankruptcy Code's broad definitions and the authorities interpreting them show that Matrix would have held contingent "claims" for the return of the funds. See 11 U.S.C. § 101(5) (a "claim" is any "right to payment" including a contingent right to payment). As a result of this "claim," the Debtors owed Matrix an "antecedent debt." See 11 U.S.C. § 101(12) ("debt" is "liability on a claim").
Finally, the Court considers Matrix's argument that the payment of fees for the period that Matrix's funds were held by Action Abstract does not establish that the funds advanced were "loans." But whether Matrix is characterized as a "purchaser" or a "lender," it held a "claim" against Island Mortgage and Action Abstract for return of the funds advanced, and Island Mortgage and Action Abstract owed Matrix a corresponding antecedent "debt." See McClellan v. Cantrell, 217 F.3d 890, 895 (7th Cir.2000) ("[a] debt need not ... arise from a loan."). As an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor," Matrix is a creditor of Island Mortgage and Action Abstract. See 11 U.S.C. § 101(10)(A).
In sum, the Court concludes that the Trustee has established that by making the June Advances, Matrix became a "creditor" of the Debtors with a "claim" for the return of those funds or delivery of a promissory note executed in connection with the underlying mortgages. The Court also concludes that the June Advances gave rise to a "claim" as defined by the Bankruptcy Code. As a result, the Court concludes that Matrix is a "creditor" who was owed an "antecedent debt" by the Debtors under Sections 547(b)(1) and (b)(2) of the Bankruptcy Code.

Were the June Repayments made less than ninety days before the Petition Date, and made while the Debtors were insolvent?
The Court next considers whether the June Repayments were made "while the debtor was insolvent" and "made ... on or within 90 days before the date of the filing of the petition." 11 U.S.C. §§ 547(b)(3), (b)(4)(A). As to the first of these requirements, the record shows that the June Repayments occurred in June 2000, less than ninety days before the July 19, 2000, Petition Date of AppOnLine and Island Mortgage, and the July 28, 2000, Petition Date of Action Abstract. As to the second of these requirements, Section 547(f) provides that "the debtor is presumed *281 to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). Matrix has not presented evidence to contest, or otherwise disputed, the statutory presumption as to the Debtors' insolvency at the time that the June Repayments were made. Under these circumstances, "[w]here the transferee offers no evidence regarding solvency, the trustee may rely upon the statutory presumption." Sapir v. Keener Lumber Co. (In re Ajayem Lumber Corp.), 143 B.R. 347, 351 (Bankr.S.D.N.Y.1992).
In sum, the Court concludes that the Trustee has established that the June Repayments were made "within 90 days before the date of the filing of the petition" and "while the [Debtors] were insolvent" in accordance with Sections 547(b)(3) and (b)(4)(A) of the Bankruptcy Code.

Did the June Repayments enable Matrix to receive more than it would have received in a Chapter 7 liquidation had the June Repayments not been made ?
The Court next considers whether the June Repayments caused Matrix to receive more than it would have received in a Chapter 7 liquidation if the June Repayments had not been made. 11 U.S.C. § 547(b)(5). As the Supreme Court found:
Whether a creditor has received a preference is to be determined, not by what the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.
Palmer Clay Prods. Co. v. Brown, 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936).
In Elliott v. Frontier Props. (In re Lewis W. Shurtleff, Inc.), 778 F.2d 1416 (9th Cir.1986), the Ninth Circuit, applying the Palmer Clay test, explained:
This analysis requires that in determining the amount that the transfer "enables [the] creditor to receive," 11 U.S.C. § 547(b)(5) (1982), such creditor must be charged with the value of what was transferred plus any additional amount that he would be entitled to receive from a Chapter 7 liquidation. The net result is that, as long as the distribution in bankruptcy is less than one-hundred percent, any payment "on account" to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made.
778 F.2d at 1421 (emphasis in original).
Here, Matrix does not dispute that the June Repayments constituted payment in full of the June Advances. Nor does Matrix dispute that, as the Trustee states, "there is no prospect whatsoever that unsecured creditors will be paid in full." Trustee's S.J. Br. at 18, citing Jacobs Decl. ¶¶ 10-11. Indeed, the Trustee asserts that "unsecured creditors may well be paid only pennies on the dollar." Id. As a result, the Court concludes that the Trustee has established that the June Repayments enabled Matrix to receive more than it would have received from the Debtors in a Chapter 7 liquidation, in accordance with Section 547(b)(5) of the Bankruptcy Code.

The Ordinary Course of Business Defense
Matrix argues that if the June Repayments are deemed preferences under Section 547(b), they are nevertheless insulated from avoidance by the ordinary course of business exception set forth in Section 547(c)(2). Matrix S.J. Br. at 20-22. This Section provides that an otherwise avoidable preferential transfer may not be avoided if the transfer was:

*282 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and (C) made according to ordinary business terms.
11 U.S.C. §§ 547(c)(2)(A)-(C).
The ordinary course of business exception serves an important purpose in protecting parties who enter into routine business transactions in the weeks and months before a company seeks bankruptcy protection. In the absence of this protection, troubled companies might well find themselves unable to conduct the most routine business operations as the prospect of bankruptcy loomed. As the Eighth Circuit observed:
The purpose of the ordinary course of business exception is reflected in its legislative history: "The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."
Jones v. United Savings and Loan Ass'n (In re U.S.A Inns of Eureka Springs, Ark, Inc.), 9 F.3d 680, 683 n. 4 (8th Cir. 1993) (quoting S. REP. NO. 95-989, at 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874; H.R. REP. NO. 95-595, at 373 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6328).
Preference law, while undoubtedly frustrating to the affected creditor, is essential to the orderly operation of the bankruptcy system. It advances the "prime bankruptcy policy of equal distribution among similarly situated creditors" and "discourages creditors from racing to the courthouse to dismember the debtor during its slide into bankruptcy." In re Bullion Reserve of North America, 836 F.2d at 1217. In recognition of these important purposes, courts recognize that exceptions to Section 547(c) "should be narrowly construed." Hassett v. Goetzmann (In re CIS Corp.), 195 B.R. 251, 257 (Bankr.S.D.N.Y.1996).
A creditor seeking to establish the ordinary course of business defense must prove each of the elements set forth in Section 547(c)(2) by a preponderance of the evidence. See 11 U.S.C. § 547(g). "Failure under any one of the three elements dooms the entire exception." Seaver v. Allstate Sales & Leasing Corp. (In re Sibilrud), 308 B.R. 388, 393 (Bankr. D.Minn.2004).
The Trustee argues that as a threshold matter, the ordinary course of business defense is not available to Matrix because "debts incurred and payments made in furtherance of fraudulent schemes, including Ponzi Schemes, are not shielded by [Section 547(c)(2) ]." Amended Trustee's Memorandum of Law in Opposition to Matrix Capital Bank's Motion for Summary Judgment dated April 5, 2004 ("Trustee's Opp. Br."), at 34. Some courts have held that "Ponzi schemes simply are not legitimate business enterprises which Congress intended to protect with section 547(c)(2)." Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.), 819 F.2d 214, 217 (9th Cir.1987); see 5 COLLIER ON BANKRUPTCY, ¶ 547.04[2][b][ii] (15th ed. rev.2003). Other courts disagree. See, e.g., Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 874 (D.Utah 1987); 5 COLLIER ON BANKRUPTCY, ¶ 547.04[2][b][iii] (15th ed. rev.2003). This Court prefers the "middle ground" approach taken by the Tenth Circuit in Jobin v. McKay (In re M & L Business Mack Co.), 84 F.3d 1330 *283 (10th Cir.1996), cert, denied, 519 U.S. 1040, 117 S.Ct. 608, 136 L.Ed.2d 534 (1996), as follows:
Although several courts have concluded that transfers by a debtor engaged in a Ponzi scheme do not, as a matter of law, involve ordinary business terms, we have chosen a middle ground.... [T]he § 547(c)(2) defense is inapplicable to payments to investors in a Ponzi scheme. However, ... payments to non-investment creditors could be made according to ordinary business terms and in the ordinary course of business such that these [creditors] are entitled to the § 547(c)(2) defense.
84 F.3d at 1340.
Matrix claims that the Trustee "has not established that [the Debtors] were in fact operating a Ponzi scheme," and asserts that "Island did operate a legitimate mortgage origination business to a degree. By the Trustee's count, Island closed at least 700 mortgage purchase and sale transactions with Matrix alone during a 5{6 month period in 2000." Matrix Reply Br. at 14. In any event, Matrix contends it was not an "investor in the scheme, but rather, Island [Mortgage] was a participant in Matrix's mortgage warehouse program." Id.
Here, regardless of whether the Debtors' business operations may accurately be characterized as a "Ponzi scheme," the record shows that Island Mortgage closed at least 700 mortgage purchase and sale transactions with Matrix during a five and one-half month period in 2000. These legitimate business activities lead the Court to conclude that Matrix may pursue the ordinary course of business defense. Accordingly, the Court will turn to the elements of that defense under Section 547(c)(2).
First, the Court considers whether the June Repayments were "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee" as required by Section 547(c)(2)(A). As one court observed, this "contemplated] a subjective test: Was the debt and the transfer ordinary as between the debtor and the creditor? To be subjectively ordinary implies some consistency with other business transactions between the parties." Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.), 182 B.R. 728, 734-35 (Bankr.W.D.Va.1995) (citation omitted).
Here, the record shows that Matrix and the Debtors conducted numerous transactions under the Agreement, and that the June Advances were made pursuant to the Agreement. Howard Aff. ¶ 26. The record also shows that the parties contemplated the return of funds advanced for specific mortgage loan transaction when that mortgage loan did not close. Howard Aff. ¶ 25. As discussed above, Matrix held a "claim" against the Debtors for return of the June Advances or delivery of a promissory note executed in connection with the underlying mortgages, and the Debtors owed Matrix a corresponding "debt." See pp. 277-80, supra. Accordingly, the Court concludes that the June Repayments were "in payment of a debt incurred by the debtor in the ordinary course of business ... of the debtor and the transferee" under Section 547(c)(2)(A).
Next, the Court considers whether the June Repayments were "made in the ordinary course of business or financial affairs of the debtor and the transferee" as required by Section 547(c)(2)(B). "This is a subjective element that requires an examination of whether a transfer was ordinary between the parties to the transfers." In re Carrozzella & Richardson, 247 *284 B.R. at 603. This examination, in turn, calls for the consideration of several factors. As one court found:
In determining whether a payment is made in the ordinary course of business, the facts and circumstances surrounding the payments must be considered. Factors which militate against a finding of ordinary course of business include untimeliness of the payment, change in method of payment by cashiers check rather than corporate check, and payment made pursuant to unusual economic pressure and unusual debt collection or payment practices
Tolz v. Signal Capital Corp. (In re Mastercraft Graphics, Inc.), 157 B.R. 914, 919 (Bankr.S.D.Fla.1993) (citations omitted).
Causation must also be considered by the Court. As the Eleventh Circuit observed, "whenever the bankruptcy court receives evidence of unusual collection efforts it must consider whether the debtor's payment was in fact in response to these efforts." Marathon Oil Co. v. Flatau (In re Craig Oil Co.), 785 F.2d 1563, 1566 (11th Cir.1986). The burden is on the creditor to show "the absence of any unusual collection efforts or protectionist demands directed at the debtor, and the absence of any other significant or material change in the way it treated the debtor during the preference period, along with the absence of any material change in the means, manner and amounts of payments made by the debtor." Marlow v. Federal Compress & Warehouse Co. (In re Julien Co.), 157 B.R. 834, 838 (Bankr. W.D.Tenn.1993).
The Trustee argues that the June Repayments were not "ordinary" between the parties because they were made "extremely" late in contrast to repayments made before the preference period. "Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception." In re Craig Oil Co., 785 F.2d at 1567. But "there is no per se rule that late payments can never be ordinary; late payments can properly fall within the ordinary course of business exception where the prior course of conduct between the parties demonstrates that those types of payments were ordinarily made." Gold Force Int'l Ltd. v. Official Comm. of Unsec. Creditors of Cyberrebate.com Inc., 2004 WL 287144, *4 (E.D.N.Y.2004).
In particular, the Trustee asserts that the June Repayments were made 300 percent later than the average of such payments made before the preference period. Put another way, the Trustee asserts that repayments before the preference period were made in an average of 6.04 business days, or one day later than the prescribed five day period; while the June Repayments were made in an average of 9.09 business days, or three additional days later. Trustee's Opp. Br. at 41.
In response, Matrix asserts that "the return of funds was so much a part of normal business during the parties' relationship that Matrix required [the Debtors] to make such payments within five days of a failed closing." Matrix S.J. Br. at 21. Matrix states that "[approximately forty-five (45%) percent of the funds returned in the June 8 Payment, the June 14 Payment, the June 15 Payment, the June 16 Payment, and the June 20 Payment were returned within 6 or fewer days of their initial wiring by Matrix to Action." Howard Aff. ¶ 42. This, Matrix argues, shows that the June Repayments were "ordinary" between the parties.
The Court finds that the June Repayments were made in an average of nine business days after the associated debt was incurred. The Court further finds that before the preference period, repayments *285 were made in an average of six business days. The Court concludes the difference between these periodsthree business daysis not sufficient to take the June Repayments outside of the ordinary course of business established between the parties. See Brothers Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Brothers Gourmet Coffees, Inc.), 271 B.R. 456, 461 (Bankr.D.Del.2002) (preference period payments made one day later than prepreference period payments deemed not material); In re Valley Steel Corp., 182 B.R. at 737 (preference period payments made thirteen days later than pre-preference period payments deemed to be within acceptable range).
The Trustee also argues that the June Repayments, which were made from June 8 to June 23, 2000, were not "ordinary" between the parties because they were made after Matrix terminated the Agreement on June 6, 2000. The Trustee argues that "the termination of the parties' business relationship is clearly an extraordinary event that ... renders payments made thereafter out of the ordinary course." Trustee's Opp. Br. at 37. The Trustee relies on Xtra Inc. v. Seaivinds Ltd. (In re Seawinds Ltd.), 91 B.R. 88 (N.D.Cal.1988), affd 888 F.2d 640 (9th Cir.1989), where the court found that seven payments made after a notice of termination were "outside the `ordinary course of business or financial affairs of the debtor and the transferee,'" and further observed that "avoidance of all of the payments is in accordance with both bankruptcy policy and common sense." In re Seawinds Ltd., 91 B.R. at 92 (quoting 11 U.S.C. § 547(c)(2)(B)).
But there is at least one significant difference between the situation presented in In re Seawinds Ltd. and the facts present here. In In re Seawinds Ltd., the creditor terminated its leases with the debtor effective immediately and demanded payment from the debtor on past due invoices. When the payments were made, the contract was no longer in effect. Under those circumstances, the court found:
A creditor who takes the steps of terminating its contracts with a struggling debtor, demanding immediate payment and return of equipment, and then raising rates on any remaining equipment is using economic pressure to obtain payment as soon as possible. Within the 90 day preference period, such payments are made to the detriment of other creditors. This discrimination between creditors is the essence of a preference, and is prohibited by the Bankruptcy Code.
In re Seawinds Ltd., 91 B.R. at 92.
Here, by contrast, the record shows that Matrix terminated the Agreement on June 6, 2000, and provided ten days to transition out of the Agreement. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 166:6-167:18. The record also shows that Matrix continued to fund the purchase of mortgages through June 9, 2000. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 167:15-24. The Court concludes that Matrix's termination of the Agreement before the June Repayments were made is not sufficient to take the June Repayments outside of the ordinary course of business established between the parties.
The Trustee further argues that the June Repayments were not "ordinary" between the parties because they were made in response to "an extensive, concerted campaign to maximize pressure on the Debtors." Trustee's Opp. Br. at 38. "Payments made in response to unusual debt collection practices by the creditor are outside the scope of the ordinary course of business exception." Schwinn Plan Comm. v. AFS Cycle & Co. (In re Schwinn Bicycle Co.), 205 B.R. 557, 572 *286 (Bankr.N.D.Ill.1997). See In re Mastercraft Graphics, Inc., 157 B.R. at 919 (payments "made pursuant to unusual economic pressure and unusual debt collection or payment practices" are not "ordinary" between the parties). As noted by the Eleventh Circuit, "[Section] 547(c)(2) should protect those payments which do not result from `unusual' debt collection or payment practices. To the extent an otherwise `normal' payment occurs in response to such practices, it is without the scope of § 547(c)(2)." In re Craig Oil Co., 785 F.2d at 1566.
Here, the record shows that Matrix made substantial and unusual efforts to induce the Debtors to repay the June Advances, beginning with a series of communications between Matrix and the Debtors and State Bank on and after June 13, 2000. The record shows:
 Between June 13 or 14 and June 22, 2000, Mr. Howard, Matrix's Executive Vice President and Chief Operating Officer, made daily telephone calls to Edward Capuano, President of Island Mortgage, to inquire about collateral exceptions and obtain updates on which mortgages had closed. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 171:2-173:15.
 On June 14, 2000, Mr. Howard sent a letter by fax and overnight courier to Robert Knickman, President of Action Abstract, demanding that numerous amounts, including the June Advances, be wired back to Matrix within twenty-four hours. Jacobs Supp. Decl. Exh. L (June 14, 2000 letter from Patrick Howard to Robert Knickman); Exh. D (testimony of Patrick Howard) at 174:13-175:24. Mr. Howard had not done this before. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 177:15-21.
 On June 14, 2000, Yolanda Byford, the operations supervisor and underwriter for Matrix's warehouse lending department, sent an e-mail message to Mr. Howard reporting that, in addition to calling Island Mortgage, she had called "Jason" at Action Abstract "every fifteen minutes" that day to request repayment of amounts advanced to the Debtors and that Jason had not returned her calls. Jacobs Supp. Decl. Exh. M (June 14, 2000, e-mail from Yolanda Byford to Patrick Howard); Exh. F (testimony of Yolanda Byford) at 187:25-188:13, 189:22-190:22. Mr. Howard acknowledged that "[p]rior to early June 2000, it would have been out of the ordinary for Ms. Byford to make such contacts with Action Abstract." Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 179:16-180:12.
 On June 14, 2000, Ms. Byford sent a fax to Action Abstract demanding repayment of funds advanced by Matrix and threatening legal action if the repayment was not forthcoming. Jacobs Supp. Decl. Exh. N (June 14, 2000, facsimile from Yolanda Byford to Action Abstract).
 On June 14, 2000, Ms. Byford directed that a "hold" be put on the Concentration Account held at Matrix, barring Island Mortgage from making any withdrawals from that account. Jacobs Supp. Decl. Exh. O (June 14, 2000, e-mail from Yolanda Byford to Maria Mauricio); Exh. F (testimony of Yolanda Byford) at 191:16-192:12. Matrix had not done this before. Jacobs Supp. Decl. Exh. F (testimony of Yolanda Byford) at 192:13-21. Ms. Byford directed that this action be taken to "tie up any assets we had of [Island Mortgage's] ... because we had so much collateral outstanding." *287 Jacobs Supp. Decl. Exh. F (testimony of Yolanda Byford) at 194:14-22.
 On June 14 and 15, 2000, Matrix contacted State Bank to request the return of amounts advanced to Action Abstract. Jacobs Supp. Decl. Exh. F (testimony of Yolanda Byford) at 194:23-196:5. Matrix had not taken such action before in its dealings with the Debtors. Jacobs Supp. Decl. Exh. F (testimony of Yolanda Byford) at 196:10-22. State Bank responded that it could not deliver funds to Matrix without authorization from Action Abstract. Jacobs Supp. Decl. Exh. P (June 16, 2000, wire advice from State Bank to Matrix). Ms. Byford was not surprised by this result and testified that "It was just in line with everything else that they had done. We weren't getting our funds back and we were trying any way we could to get them back and this just struck me as another way they were avoiding doing that." Jacobs Supp. Decl. Exh. G (testimony of Yolanda Byford) at 303:17-21.
The record further shows that beginning on June 19, 2000, Matrix increased its collection efforts and began to contact regulators and law enforcement authorities, as follows:
 On June 19, 2000, Ms. Byford wrote to the Attorney General of the State of New York to report that the Debtors had failed to deliver original notes or return funds advanced by Matrix and to request the Attorney General's assistance in collecting the amounts due. Jacobs Supp. Decl. Exh. Q (June 19, 2000, letter from Yolanda Byford to Eliot Spitzer, Attorney General of the State of New York); Exh. F (testimony of Yolanda Byford) at 197:3-198:3. Ms. Byford testified that this letter was sent "[bjecause Island Mortgage was not cooperating, so we wanted to go to a higher authority." Jacobs Supp. Decl. Exh. F (testimony of Yolanda Byford) at 198:13-19.
 On June 20, 2000, Ms. Byford sent similar letters to the New York State Banking Department and the New York State Insurance Department. Jacobs Supp. Decl. Exh. R (June 20, 2000, letters from Yolanda Byford to New York State Banking Department and New York State Insurance Department); Exh. S (undated memorandum from Yolanda Byford to Patrick Howard); Exh. F (testimony of Yolanda Byford) at 202:19-203:11, 205:17-206:7, 206:17-207:18. Ms. Byford testified that she sent these letters "[f]or assistance in retrieving our collateral or the $5.3 million." Jacobs Supp. Decl. Exh. F (testimony of Yolanda Byford) at 203:8-11.
 On June 20, 2000, Ms. Byford spoke with representatives of the New York State Banking Department and was informed that they would send investigators to Island Mortgage within the next few days. Jacobs Supp. Decl. Exh. F (testimony of Yolanda Byford) at 203:21-205:2.
The record further shows that beginning on June 22, 2000, senior executives from Matrix augmented its collection efforts by traveling from New Mexico to New York to meet with the Debtors and regulators and demand repayment, as follows:
 On June 22, 2000, Mr. Howard flew from Matrix's New Mexico offices to New York to recover the monies advanced by Matrix or original notes relating to closed mortgages. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 187:11-188:24. Mr. Howard was accompanied by Bruce Allen, an employee of Matrix who had no experience with the Island Mortgage *288 account but was, according to Mr. Howard, a "big guy." Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 189:25.
 On June 23, 2000, Messrs. Howard and Allen arrived at Island Mortgage's offices in Melville, New York. Jacobs. Supp. Decl. Exh. D (testimony of Patrick Howard) at 190:9-20. Mr. Howard and Mr. Allen then met for two hours with regulators from the New York State Banking Department, who had commenced an investigation at Island Mortgage's offices. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 193:9-20. Mr. Capuano joined the meeting and, in the presence of a regulator from the New York State Banking Department, reviewed a list prepared by Mr. Howard of the outstanding advances. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 193:21-194:4. Mr. Capuano indicated which mortgage loans on the list had closed and which had not. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 194:5-8. He stated that as to the mortgage loans that had not closed, he had directed Action Abstract to wire transfer the funds back to Matrix that day and provided wire confirmation numbers to Mr. Howard. Jacobs Supp. Decl. Exh. D (testimony of Patrick Howard) at 194:9-18.
In response, Matrix argues that "the Trustee would have this Court punish Matrix for being diligent and conscientious in doing its best to enforce the terms of its agreement with debtors" and observes that the manner in which it monitored its collateral and enforced the Agreement was the same earlier in 2000. Matrix Reply Br. at 16. But the principle of equality of distribution could not be maintained if creditors who received payments in response to extraordinary or unusual collection efforts during the preference period were allowed to retain those payments. See Begier, 496 U.S. at 58, 110 S.Ct. 2258.
The record reflects that as early as June 13 or 14, 2000, Matrix commenced a series of unusual collection efforts including telephonic and written inquiries and demands directed to the Debtors that were described by Matrix's senior executives as "out of the ordinary"; contacts with others including State Bank, regulators, and law enforcement authorities; and ultimately, meetings with the Debtors and the New York State Banking Department; all with the purpose of obtaining repayment of the funds that Matrix advanced to the Debtors. The record further reflects that Matrix's efforts were successful, as they caused the Debtors to make a series of repayments to Matrix from June 14, 2000, immediately after these efforts began, to June 23, 2000, when the last of the June Repayments was made. See pp. 286-88, supra.
Accordingly, the Court concludes that the repayments made by the Debtors to Matrix on June 14, June 15, June 16, June 20, and June 23, 2000, were made in response to unusual collection efforts undertaken by Matrix from June 13 or 14, 2000, to June 23, 2000, and therefore, that these repayments were not "made in the ordinary course of business or financial affairs" of the Debtors and Matrix as required by Section 547(c)(2)(B). The Court further concludes that the repayment made by the Debtors to Matrix on June 8, 2000, in the amount of $1,561,595, was not made in response to unusual collection efforts by Matrix, and that it otherwise was "made in the ordinary course of business of financial affairs" of the Debtors and Matrix.
Next, the Court considers whether the June 8 Repayment was "made *289 according to ordinary business terms" as required by Section 547(c)(2)(C). As the Second Circuit held, "11 U.S.C. § 547(c)(2)(C) requires a creditor to demonstrate that the terms of the payment for which it seeks the protection of the ordinary course of business exception fall within the bounds of ordinary practice of others similarly situated." In re Roblin Indus., Inc., 78 F.3d at 41. This "does not require a creditor to establish the existence of some uniform set of business terms within the industry in order to satisfy its burden. It requires evidence of a prevailing practice among similarly situated members of the industry facing the same or similar problems." In re U.S.A. Inns of Eureka Springs, Ark., Inc., 9 F.3d at 685. As noted by the Eighth Circuit:
"`[O]rdinary business terms' refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and ... only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection [547(c)(2)(C)]."
Id. (quoting In re Tolona Pizza Prod. Corp., 3 F.3d 1029, 1033 (7th Cir.1993)).
The record reflects that the June 8 Repayment consisted of repayment to Matrix for advances made in respect of thirteen mortgage loans that did not close. Jones Decl. ¶ 12. The amounts of the unclosed mortgage loans that led to the June 8 Repayment ranged from $43,346 to $331,500. Id. The record further shows that the Debtors made the June 8 Repayment within five to eight business days after Matrix funded the corresponding thirteen unclosed mortgage loans, and as to twelve of the thirteen, within five or six business days. Jones Decl. ¶ 11, Exh. B (payment/repayment data).
The record also shows that the Debtors' mortgage banking operations were generally conducted as follows:
If the underlying mortgage did not close, the Debtors would return the money advanced by the warehouse bank, together with interest, fees and charges on the advance. The number of days the money remained at the Debtors would vary depending on, among other things, the requirements of the warehouse bank that had made the advance and the thoroughness with which the warehouse bank policed those requirements.
Jones Decl. ¶ 8. The record shows that the Agreement provided that "[Island Mortgage] shall deliver the loans to [Matrix] in purchasable form within 5 (five) days from [Island Mortgage's] disbursement of loan proceeds to borrower," but did not address the situation where the underlying mortgage loan did not close. Jones Decl. Exh. A (Agreement) ¶ 3.01(a). Thus, the record shows that it was the practice of the Debtors to return funds advanced by one of its warehouse banks in the event that the underlying mortgage did not close, and that the Agreement did not vary that practice as to Matrix.
Moreover, the record reflects that mortgage banking warehouse lending agreements generally provide for a transaction to be completed within a specified time limit. Martinez Aff. ¶ 19; WAS Report at 9. The record further shows that the relationship between Matrix and the Debtors was consistent with industry standards in that Matrix's selection of a repurchase facility as the form of its warehouse program was consistent with industry standards of care, and further, that the Agreement contained the key elements that would be considered normal and customary by a prudent warehouse lending provider. Martinez Aff. ¶ 27; WAS Report at 16-18.
*290 In sum, the Court finds that the record reflects that the practice of the Debtors to return funds advanced by one of its warehouse banks in the event that the underlying mortgage did not close in response to requests by that warehouse bank was "a prevailing practice among similarly situated members of the industry facing the same or similar problems." In re U.S.A. Inns of Eureka Springs, Ark., Inc., 9 F.3d at 685. Accordingly, the Court finds that Matrix has satisfied the objective requirement under Section 547(c)(2)(C), and that the June 8 Repayment made by the Debtor to Matrix was made "according to ordinary business terms."

C. Matrix's Summary Judgment Motion on the Second Count of the Complaint

In the Second Count of the Complaint, the Trustee seeks to recover the June Repayments as avoidable fraudulent conveyances because the Debtors made the June Repayments at a time when they were insolvent or had unreasonably small capital, and Matrix did not receive the June Repayments in good faith, and therefore failed to provide fair consideration within the meaning of Section 272 of New York's Debtor and Creditor Law.
Matrix seeks summary judgment dismissing the Second Count of the Complaint on grounds that the June Repayments were held in trust by the Debtors, and therefore, were not transfers by the Debtors. Alternatively, Matrix seeks summary judgment on grounds that there was fair consideration for the transfers because they extinguished an antecedent debt owed by Island Mortgage and Action Abstract to Matrix. Matrix S.J. Br. at 22-23.
Matrix first argues that the June Repayments "did not constitute a conveyance of the debtors' property in the first place. Rather, they represented the return of Matrix property, held by the debtors in escrow and in trust." Matrix S.J. Br. at 22. As discussed above, the Court finds that Matrix has not established that the June Advances were made pursuant to an escrow or an express, resulting, or constructive trust. See pp. 273-76, supra. The Court further finds that Matrix has not shown that it can trace the June Repayments to the June Advances. See pp. 276-77, supra. As a result, the Court concludes that the June Repayments were transfers of the Debtors' property and, accordingly, Matrix is not entitled to summary judgment dismissing the Second Count of the Complaint on grounds that the June Repayments were the return of Matrix's property.
Alternatively, Matrix argues that the June Repayments were "made `for fair consideration' to satisfy an `antecedent debt'." Matrix S.J. Br. at 22. Section 272 of New York's Debtor and Creditor Law provides:
Fair consideration is given for property, or obligation,
(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.
N.Y. Debt. & Cred. Law § 272 (McKinney 2001) (emphasis added).
Interpreting Section 272, another judge of this Court found:
The Second Circuit has analyzed the elements of "fair consideration" under DCL § 272 as follows: (1) the recipient of the debtor's property "must either (a) convey property in exchange or (b) discharge *291 an antecedent debt in exchange; and (2) such exchange must be a `fair equivalent' of the property received; and (3) such exchange must be `in good faith'."
Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.), 281 B.R. 506, 518 (Bankr.E.D.N.Y.2002) (quoting HBE Leasing Corp. v. Frank, 61 F.3d 1054, 1058-59 (2d Cir.1995) (emphasis in original)), aff'd, 302 B.R. 760 (E.D.N.Y. 2003). And as the Second Circuit observed, New York law provides that "where ... a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of `good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme." HBE Leasing Corp. v. Frank, 48 F.3d 623, 636 (2d Cir.1995).
Here, the record reflects the following:
 In May 2000, Matrix learned that the Debtors had "double-banked" a loan, that is, caused a loan and supporting documentation to be offered for sale simultaneously to Matrix and another warehouse bank. Howard Aff. ¶ 36.
 In May 2000, Ms. Byford believed that she had caught the Debtors altering loan documents to induce Matrix to fund ineligible loans. Jacobs. Supp. Decl. Exh. G (testimony of Yolanda Byford) at 206:24-213:25. As Mr. Howard stated, "in mid-May 2000, Matrix came to believe that Island may have permitted the alteration of loan documents in one transaction to close upon an unsuitable loan. As a result of this discovery, Matrix temporarily suspended the [Agreement]." Howard Aff. ¶ 35.
 By letter dated June 19, 2000, Matrix contacted the Attorney General of the State of New York to assist it in collecting from the Debtors. Jacobs Decl. Exh. Q (June 19, 2000, letter from Yolanda Byford to Eliot Spitzer, Attorney General of the State of New York).
 By no later than June 22, 2000, Matrix contacted the Federal Bureau of Investigation and informed other creditors of its involvement. Jacobs Supp. Decl. Exh. S (undated memorandum from Yolanda Byford to Patrick Howard); Exh. T (June 23, 2000, memorandum from Christine Harris to Patrick Howard). On June 23, 2000, the same date on which the Debtors received the final repayment, the Federal Bureau of Investigation informed Christine Harris, Matrix's Assistant Vice President of Mortgage Lending, that they believed that Island Mortgage was a pyramid scheme. Jacobs Supp. Decl. Exh. T (June 23, 2000, memorandum from Christine Harris to Patrick Howard); Exh. H (testimony of Christine Harris) at 236:11-15.
The Court finds that the record establishes the existence of a genuine issue of material fact with respect to Matrix's good faith in receiving the June Repayments. Accordingly, Matrix's request for summary judgment dismissing the Second Count of the Complaint is denied.

CONCLUSION
For the reasons stated herein, the Trustee's Motion for Summary Judgment on the First Count of the Complaint is granted to the extent that the Court finds and concludes that the June 14 Repayment, the June 15 Repayment, the June 16 Repayment, the June 20 Repayment, and the June 23 Repayment are avoidable preferential transfers and are not excepted from the Trustee's avoidance power under the "ordinary course of business" exception of 11 U.S.C. § 547(c)(2). The Trustee's Motion *292 for Summary Judgment on the First Count of the Complaint is denied to the extent that the Court finds and concludes that the June 8 Repayment is excepted from the Trustee's avoidance power under the "ordinary course of business" exception of 11 U.S.C. § 547(c)(2). Matrix's Motion for Summary Judgment on the Second Count of the Complaint is denied.
The parties are directed to settle an order in conformity with this Memorandum Decision.
NOTES
[1] The Trustee's Motion seeks summary judgment only on the preference cause of action. The Trustee states that "an order granting summary judgment on the preference cause of action will render moot the fraudulent conveyance cause of action." See Memorandum of Law in Support of Trustee's Motion for Summary Judgment on First Count of Complaint dated February 23, 2004 ("Trustee's S.J. Br."), at 2 n. 1.
[2] Matrix offers the expert affidavit of Elsa Martinez, Senior Partner of Warehousing Advisory Services, Inc., and the expert report of Warehousing Advisory Services, Inc., in support of its motion for summary judgment. They describe warehousing lending as the "short-term borrowing of funds by a mortgage banker using permanent mortgage loans as collateral." Affidavit of Elsa Martinez in Support of the Motion for Summary Judgment of Defendant Matrix Capital Bank dated February 11, 2004 ("Martinez Aff."), ¶ 10; Report of Warehousing Advisory Services, Inc. to Matrix Capital Bank dated October 15, 2003 ("WAS Report"), at 5-7. Warehouse lending may occur through a wholesale credit agreement or a mortgage purchase/repurchase agreement between a warehouse banker and a mortgage broker. In general, the warehouse banker agrees to purchase mortgage loans meeting established product parameters for a short, fixed interval. Before the purchase, the warehouse banker reviews the underlying mortgage documentation and underwrites the loan. After the purchase, the warehouse banker holds the mortgage until the broker repackages the loan for sale to investors in the secondary mortgage market. Then, the broker repurchases the loan from the warehouse banker and sells it to other investors. Id.
[3] Ms. Martinez states that "dry" warehouse funding occurs when a mortgage loan is purchased after the loan has closed, and "wet" warehouse funding occurs when a mortgage loan is purchased at or immediately after the closing using funds that have been previously deposited by a warehouse bank with a closing agent for that purpose. Martinez Aff. ¶ 13; see Memorandum in Support of Matrix Capital Bank Motion for Summary Judgment dated April 2, 2004 ("Matrix S.J. Br.") at 4.
[4] New York law governs this question because the funds were held at State Bank which is located in New York. As the Second Circuit held, "the law of the situs of the property, and therefore the trust, governs" the formation of a trust. Sanyo Elec., Inc. v. Howard's Appliance Corp. (In re Howard's Appliance Corp.), 874 F.2d 88, 94 (2d Cir.1989). See Hassett v. Far West Fed. Sav. and Loan Ass'n (In re O.P.M. Leasing Servs., Inc.), 40 B.R. 380, 399 (Bankr.S.D.N.Y.1984) ("New York's choice of law rule pertaining specifically to the validity and construction of a nontestamentary trust of personal property has long been to apply the law of the situs of the trust without undertaking an interest analysis").